# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-4248

YETUNDE BALOGUN,

*Petitioner,*

*v.*

JOHN D. ASHCROFT,

*Respondent.*

_____

Petition for Review of an Order of the Board
of Immigration Appeals
No. A77-648-768

_____

ARGUED OCTOBER 30, 2003—DECIDED JULY 1, 2004

_____

Before RIPPLE, MANION and DIANE P. WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In December of 1999, Yetunde Balogun attempted to enter the United States without a valid entry document or labor certification and was placed in custody of the Immigration and Naturalization Service ("Agency").[1] Ms. Balogun subsequently conceded her re-

_____

[1] Recently, the Immigration and Naturalization Service was abolished, and its immigration enforcement function was transferred to the Bureau of Immigration and Customs Enforcement

(continued...)

movability but sought asylum under § 208(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(a), withholding of removal under § 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), and withholding of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"), as implemented in 8 C.F.R. § 208.16(c). On June 20, 2001, an immigration judge ("IJ") denied her requests and ordered that she be removed; the Board of Immigration Appeals ("BIA") affirmed without opinion on December 6, 2002. This petition followed. For the reasons set forth in the following opinion, we deny the petition for review and affirm the decision of the BIA.

# I

# BACKGROUND

## A. Facts

Ms. Balogun was born in 1972 in Nigeria and is currently a citizen of Nigeria. She is from the Yoruba tribe, "a State

---

[1] (...continued)

in the newly created Department of Homeland Security. *See Gonzalez v. O'Connell*, 355 F.3d 1010, 1011 n.1 (7th Cir. 2004). To avoid confusion, we shall refer to this entity as the "Agency." This petition for review challenges the decisions of the Executive Office for Immigration Review (Board of Immigration Appeals and immigration court), which is a component of the United States Department of Justice. Attorney General John D. Ashcroft is the head of the Department of Justice. The Attorney General, therefore, is correctly listed in the caption as the sole respondent. *See* 8 U.S.C. § 1252(b)(3) (2000) (explaining that the respondent is the Attorney General when the immigration court proceeding commenced after April 1, 1997).

called Ogun, with a hometown of Osheilli." A.R. 334. After high school, she attended Ogun State University for five or six years and received a degree in accounting. From 1996 or 1997 to 1999, Ms. Balogun lived in Lagos[2] with her parents, three brothers and one sister and worked as an accountant. In either March or April of 1999, she was married in Lagos to "Obu Kaloko," who is from the state of Delta and has a Urgghob tribal affiliation. *Id.* at 96.

According to an affidavit Ms. Balogun placed in the record, "about two weeks" after she got married, her parents sent for her because they had "visitors from the village wanting to know when [she] would be performing the 'rites of womanhood,' " commonly known as circumcision or female genital mutilation ("FGM"). *Id.* at 334. Ms. Balogun had "heard stories of this happening" but had "never discussed such a topic" with her family. *Id.* She did not believe that her father agreed with this practice, but "he did not want to go against the words and authority of his tribesmen." *Id.* at 334-35.

Ms. Balogun's "nightmare began thereafter." *Id.* at 335. She was "constantly being harassed and intimidated" by tribal members. *Id.* She explained:

> I felt sad and depressed. I had constant migraine and panic attacks just thinking of the whole process. . . . I would get back from work and find three to four people waiting for me and telling me that I was being stubborn and this was something I was eventually going to have to do. It got to the point that I had to stop going to work. I would lock myself inside the house and refuse

---

[2]  The record does not contain great detail about her childhood, but Ms. Balogun testified that she lived in Lagos "[p]ractically all" of her life. A.R. 93.

>   to answer bells or knocks at night. I had to switch off all
>   lights, so it would seem like no one was home.

*Id.* When it got to the point where she "just couldn't handle it," she and her husband went to his home state of Delta. *Id.* at 100. They only stayed there for "two or three" weeks due to civil unrest in the area; they then returned to Lagos. *Id.* at 101.

In May of 1999, Ms. Balogun and her husband went to visit her brother in Columbus, Ohio. When they returned to Lagos, Ms. Balogun's mother informed her that "they were still looking for" her and "pressuring" her to undergo FGM. *Id.* She and her husband then went to London for "two or three" weeks and from there came to the United States in September of 1999. *Id.* At this time, they lived with her brother in Ohio. In November, she began working in a shoe shop as a sales representative or cashier. In early December of 1999, she went to London to visit her parents. She explained: "I just . . . had to talk to my dad and explain to him about the whole thing . . . just for him to be on my side and tell him I didn't have to" undergo FGM, but "he said it wasn't his choice. That's tradition." *Id.* at 103-04. Ms. Balogun claimed that, up until this point, she thought her parents would tell the tribal elders she did not have to go through it. However, Ms. Balogun explained, after this trip to London, she decided that she could not go back to Nigeria.

On December 12, 1999, Ms. Balogun attempted to return from London to the United States, but she was stopped for an immigration inspection at Chicago's O'Hare International Airport and found to be without a valid entry document or labor certification. At her airport interview, Ms. Balogun explained that she was married, but she falsely stated that she thought her husband was in Nigeria but was not sure because they did not talk. *Id.* at 345. She also had a

picture of her husband, *id.* at 125, which she told the immigration official was her "boyfriend," *id.* at 347. Ms. Balogun later explained that she told these lies because "I was just picked up from the airport, and I was scared that they were going to pick him up too." *Id.* at 124.

Ms. Balogun also told the immigration official that she had come to the United States on two previous occasions. She falsely claimed that the purpose of a previous trip was to "buy [ ] things to sell" in her country, and that she had come back to the United States to "buy some more things and sell." *Id.* at 345-46. Ms. Balogun later explained that "I didn't want to tell them I was working because . . . I was scared . . . because I knew I wasn't supposed to be working." *Id.* at 105. Ms. Balogun was asked the following at the end of her interview:

> Q. Do you have any fear or concern about being returned to your home country or being removed from the United States?
>
> A. I don't know, Maybe[.]
>
> Q. Would you be harmed if you are returned to your home country or country of last residence?
>
> A. May be [sic], I don't know[.]

*Id.* at 348.[3]

---

[3] Ms. Balogun had a credit card application, among other documents, in her possession when she was stopped in the airport. This application, which was signed by Ms. Balogun on December 4, 1999, listed her residence as Ohio, her employer as "DSW" and her "source of other income" as "Daily Mart." A.R. 352. It also contained a social security number. *Id.* She also had in her possession a work statement from Shonac Corporation with some

(continued...)

At some point, Ms. Balogun told the immigration officials that she had a fear of going back to Nigeria. A "Form I-275" dated December 13, 1999, notes: "About the time the subject had to be taken to her flight to depart the United States, she claimed she had fear to go back to her home country." *Id.* at 350. Ms. Balogun was then transported to Paige County Jail. There, she met with her attorney, who then accompanied her to her "credible fear" or "well-founded fear" interview. *Id.* at 126-27. At this interview, she told immigration officials that she could not return to Nigeria because she would be forced to undergo FGM. *Id.* at 106.

At her merits hearing, Ms. Balogun explained that she knew she would have to undergo FGM if she returned because her mother told her "they're still harassing them [her parents] and asking why I haven't come back and what my dad is doing about it." *Id.* She explained that it was her father's family who sought to have her undergo FGM. Specifically, she linked the FGM practice which was being forced upon her to the elders from her village, Osielle, which is in Ogun State. *See id.* at 111 ("This—the traditional thing has to do with my village . . . ."); *id.* at 113-14 (explaining the "village elders of Osielle are the ones" insisting she undergo FGM). She further explained that, although she lived in Lagos and visited Osielle infrequently, the elders could and would come to Lagos, which was about an hour and a half away, on a regular basis. *Id.* at 114.

Ms. Balogun submitted into evidence a March 2001 hand-written letter to her from her mother at the merits hearing.

---

[3] (...continued)
of the same information. *Id.* at 354. In her interview, she explained that she had a social security card. *Id.* at 346-47. She admitted that she did not have permission to work in the United States. *Id.* at 347.

*Id.* at 272. This letter stated: "The elders keep asking when you are coming back to perform the traditional rites." *Id.* The letter asked Ms. Balogun not to blame her father for not preventing the elders from forcing her to undergo FGM because it is "his tradition, his mother and sisters went through it and the [sic] expect his daughters to do the same." *Id.* The letter concludes by "Mum" explaining that she supported Ms. Balogun and encouraged her to "stay away for as long as possible." *Id.* Ms. Balogun testified that she was unsure if her mother had undergone FGM. *Id.* at 110. She also testified to her belief that her sister, who was eighteen at the time of the hearing, had not undergone FGM. *Id.* at 56.

Ms. Balogun also entered into evidence a number of documents regarding the prevalence of FGM in Nigeria. The 1997 Department of State Position Paper or Bulletin on FGM notes that different studies place the rate of FGM from sixty to ninety percent but that "anecdotal evidence suggests" that the current rate is "probably under" fifty percent "and gradually decreasing." *Id.* at 153. This Paper specifically confirms that the Yoruba tribe practices FGM. *Id.* at 154. It notes that there is "little active government support for the national campaign against FGM, [but] governmental officials have voiced their support for the movement." *Id.* at 155. The 2000 Department of State Country Report on Human Rights notes two studies which identify the incidence of FGM at approximately fifty and sixty percent, respectively. *Id.* at 255. The Report states that the country has "taken no legal action to curb the practice. There are no federal laws banning FGM." *Id.* at 254-55. It explains that some states, including Ogun, have banned FGM, but "the punishments imposed are minimal." *Id.* at 255. The Report also notes that the press repeatedly criticize the practice and "most observers agree that the number of females who are

currently subjected to FGM is declining."[4] *Id.*

## B. Agency Proceedings

The first Notice to Appear which was issued to Ms. Balogun was stricken by the IJ because it contained numerous errors.[5] The amended Notice to Appear charged her as being removable because she was an alien seeking admission to perform labor without a valid labor certificate under § 212(a)(5)(A) of the INA, 8 U.S.C. § 1182(a)(5)(A), and as an alien not in possession of a valid entry document under § 212(a)(7)(A)(i)(I) of the INA, 8 U.S.C. § 1182(a)(7)(A)(i)(I). In a November 7, 2000 hearing before the IJ, Ms. Balogun conceded that she was removable on these grounds; however, she informed the IJ that she would be seeking asylum under § 208(a) of the INA, 8 U.S.C. § 1158(a), withholding of removal under § 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), and withholding of removal under the Convention Against Torture, as implemented in 8 C.F.R. § 208.16(c).

---

[4] Other documents entered into evidence were generally consistent with the conclusions in the 1997 Paper and 2000 Country Report. *See* A.R. 158-59 (article from the Canadian Immigration and Refugee Board); *id.* at 164-263 (Nigeria country assessment prepared by Britain's Immigration and Nationality Directorate).

[5] This notice incorrectly identified Ms. Balogun as Chinese. A.R. 364. It also erroneously charged her with misrepresenting her true identity when she entered the United States. *Id.* Ms. Balogun's counsel explained that what he thinks happened is that Ms. Balogun's paperwork was processed "with a number of people—some of whom were Chinese, and apparently in putting the paperwork together, they put a set of facts from one person and transposed it into her charges." *Id.* at 55.

On June 20, 2001, after a hearing on the merits, the IJ issued an oral opinion denying Ms. Balogun's requested relief. Beginning with the asylum claim, the IJ explained that "[t]he central issue in this case . . . I think is not the background information but rather the credibility of this particular applicant." A.R. 43. The IJ principally relied upon three factors that, in his opinion, affected adversely Ms. Balogun's credibility. First was the timing of the claim. The IJ explained that, on her previous trips, Ms. Balogun had not sought asylum or otherwise expressed a fear of returning to Nigeria. Ms. Balogun claimed that she told her cousins in Ohio of her fear, the IJ noted, but she produced no evidence to corroborate that claim nor did she explain why such evidence would be difficult to obtain. The IJ further relied on the fact that, when asked by immigration officials at the airport whether she feared returning to Nigeria, Ms. Balogun responded: "I don't know. Maybe." *Id.* at 44. The IJ did not credit her claim that this statement was made out of nervousness.

The second reason that caused the IJ to doubt Ms. Balogun's fear was credible was Ms. Balogun's family situation. Specifically, the IJ noted that Ms. Balogun did not know if her mother or sister had undergone FGM. Lastly, the IJ doubted Ms. Balogun's credibility because of the misrepresentations she made during her airport interview. The IJ recognized that these misrepresentations did not involve "a material aspect of the respondent's claim," but he found they did show a "propensity to dissemble and to distort the truth when the need arises. It is I think relevant in a case where the respondent is essentially asking the Court to accept her account at face value." *Id.* at 46. For these three reasons, the IJ concluded that Ms. Balogun's "expressed fear of returning to Nigeria because of FGM is not a credible fear." *Id.* at 47.

The IJ then added that he found Ms. Balogun's background information on FGM as it relates to her situation to be inadequate. He explained that "the background information, although showing that FGM continues to be a problem in Nigeria, does not provide the sort of support that the respondent has contended. For example, the respondent is from Ogun State which has passed a law against the practice."[6] *Id.* For these reasons, the IJ denied Ms. Balogun's asylum request. The IJ then denied Ms. Balogun's requests for withholding of removal under the INA and the Convention Against Torture[7] and ordered that Ms. Balogun be removed from the United States to Nigeria.

## II

## DISCUSSION

### A.  Standard of Review

Because the BIA summarily affirmed the IJ's opinion, we

---

[6]  Earlier in the opinion, the IJ explained his view of the reports submitted into evidence:

> What these reports indicate is that FGM is a problem in Nigeria; that in some areas it's not practiced, in other areas it's declining; that the government has, through its public health organizations and agents, opposed FGM but that there is no law against it. However, the reports also state that in Ogun State the practice has been outlawed. This is notable in this case insofar as the respondent is from Ogun State and lived there.

A.R. 42-43.

[7]  Ms. Balogun did not address her claim pursuant to the Convention Against Torture in her opening brief. Therefore, the claim is abandoned, and we shall not further address it. *See Luellen v. City of East Chicago*, 350 F.3d 604, 612 n.4 (7th Cir. 2003).

base our review on the IJ's analysis. *See Mousa v. INS*, 223 F.3d 425, 428 (7th Cir. 2000). We review the IJ's denial of Ms. Balogun's petition for asylum and withholding of removal under the highly deferential substantial evidence test. *See Ememe v. Ashcroft*, 358 F.3d 446, 450 (7th Cir. 2004). Pursuant to this test, we must uphold the IJ's findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole; we may reverse the IJ's determinations only if we determine that the evidence *compels* a different result. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Ememe*, 358 F.3d at 451; *see also* 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."). The IJ's "[c]redibility determinations are questions of fact and should only be overturned under extraordinary circumstances, although they must be supported by specific, cogent reasons that bear a legitimate nexus to the finding." *Pop v. INS*, 270 F.3d 527, 530-31 (7th Cir. 2001) (internal quotation marks and citations omitted).

## B. Asylum

8 U.S.C. § 1158(b)(1) affords the Attorney General the discretionary authority to grant "asylum to an alien . . . if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." Section 1101(a)(42)(A) defines "refugee" as one who is unable or unwilling to return to her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." The burden of proof is on Ms. Balogun to show that she is a "refugee" and is eligible for asylum. *See* 8 C.F.R. § 208.13(a).

The Agency does not dispute, at least with any force, that the type of FGM which Ms. Balogun has alleged is "persecution."[8] *See Tesfu v. Ashcroft*, 322 F.3d 477, 480-81 (7th Cir. 2003) (defining "persecution"); *see also In re Kasinga*, 21 I. & N. Dec. 357, 358, 1996 WL 379826 (BIA 1996) (en banc) (holding that FGM may constitute "persecution"). The Agency also does not challenge that her "persecution" would be "on account of" one of the statutory grounds. *See* 8 U.S.C. § 1101(a)(42)(A). Rather, at issue in this case is the validity of Ms. Balogun's claimed "well-founded fear" of FGM if she returns to Nigeria. *See* 8 C.F.R. § 208.13(b)(2). "[T]he well-founded fear standard [requires] a showing of a 'reasonable possibility' of persecution." *Sayaxing v. INS*, 179 F.3d 515, 520 (7th Cir. 1999). As we have explained, the "well-founded fear" test breaks down into two components: The asylum applicant must show (1) that she has a genuine, subjective fear of persecution and (2) that her fear is objectively reasonable.[9] *See Selimi v. Ashcroft*, 360 F.3d 736, 740

---

[8] "[P]ersecution cognizable under the Act can emanate from sections of the population that do not accept the laws of the country at issue, sections that the government of that country is either unable or unwilling to control." *Borja v. INS*, 175 F.3d 732, 735 n.1 (9th Cir. 1999) (en banc); *see also Chitay-Pirir v. INS*, 169 F.3d 1079, 1081 (7th Cir. 1999); *Sotelo-Aquije v. Slattery*, 17 F.3d 33, 37 (2d Cir. 1994) ("[T]he statute protects against persecution not only by government forces but also by nongovernmental groups that the government cannot control."); *Bartesaghi-Lay v. INS*, 9 F.3d 819, 822 (10th Cir. 1993) ("[I]t is apparently agreed that the possible persecution to be established by an alien in order for him to be eligible for asylum may come from a non-government agency which the government is unwilling or unable to control.").

[9] Because Ms. Balogun has not stated a claim of "past perse-
(continued...)

(7th Cir. 2004) (explaining that an asylum applicant must show a "subjective fear" and that "a reasonable person in his shoes would fear persecution"). The "subjective fear component turns largely upon the applicant's own testimony and credibility." *Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004); *see also Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir. 1999) ("An alien satisfies the subjective component by credibly testifying that he genuinely fears persecution."). The objective component requirement can be met "either through the production of specific documentary evidence or by credible and persuasive testimony." *Duarte de Guinac*, 179 F.3d at 1159.

As these statements reveal, credibility is the linchpin of a "well-founded fear" claim. This is especially true of the subjective component, on which the IJ focused in denying Ms. Balogun's claim. *See* A.R. 43, 47 ("The central issue in this case . . . is . . . the credibility of this particular applicant. . . . I have concluded that the respondent's expressed fear of returning to Nigeria because of FGM is not a credible fear . . . ."). "A credibility analysis assesses the applicant's claim only for internal consistency, detail, and plausibility," in light of the applicant's testimony and the background evidence. *Capric*, 355 F.3d at 1086. The applicable regulations and our case law explain that the "testimony of the applicant, if credible, *may* be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a) (emphasis added); *see also Capric*, 355 F.3d at 1085.

> However, if the IJ finds the testimony to be incredible, then a convincing explanation of the discrepancies or extrinsic—and credible—corroborating evidence is required. *See, e.g., de Leon-Barrios v. INS*, 116 F.3d

---

[9] (...continued)
cution," as understood in 8 C.F.R. § 208.13(b)(1), we shall not discuss that somewhat different route to asylum relief.

391, 393-94 (9th Cir. 1997). Without such an explana-
tion or corroboration, whether included with the ap-
plication, presented at the hearing, or submitted via a
motion to reopen the case to supplement the record
during the pendency of an appeal to the BIA, the
applicant cannot meet his burden of proof and his
asylum claim will fail. *See, e.g., Mansour v. INS,* 230 F.3d
902, 906 (7th Cir. 2000) (affirming asylum denial where
applicant's testimony was riddled with discrepancies,
which the applicant failed to explain except to allege a
language difficulty); *Malek v. INS,* 198 F.3d 1016, 1019-21
(7th Cir. 2000) (affirming asylum denial where the
applicant's testimony was found to be "vague, [and]
lacking in internal consistency and plausibility" and
where corroborating testimony was unpersuasive
because the witnesses had limited knowledge of the
alien's experiences in his home country); *Ahmad v. INS,*
163 F.3d 457, 461-63 (7th Cir. 1999) (affirming asylum
denial where applicant's testimony conflicted with his
asylum application, where the IJ disbelieved a letter
corroborating the applicant's membership in a political
party, and where the applicant failed to submit addi-
tional corroborative evidence).

*Capric,* 355 F.3d at 1086.

The IJ cited three pieces of evidence that caused him to
enter an adverse credibility determination: (1) the timing
of Ms. Balogun's claim, (2) her particular family situation
and family history with FGM and (3) "her lack of credibility
at critical moments in the past." A.R. 47. In addition, he
noted that the "background information, although showing
that FGM continues to be a problem in Nigeria, does not
provide the sort of support that the respondent has con-

tended."[10] *Id.* Ms. Balogun challenges the three listed factors as not going to "the heart of Petitioner's claim" and as lacking evidentiary foundation. Petitioner's Br. at 22-23. She further alleges that the "background information" "confirm[s] the high incidence of FGM in Nigeria and establish[es] that Petitioner's claim that she fears being subjected to FGM is plausible." *Id.* at 27. We shall analyze each of these factors in turn.

### 1. Timing

The IJ's first reason for questioning Ms. Balogun's credibility—the "timing of her claim"—is probative and supported by the evidence. As he noted, Ms. Balogun traveled to the United States and Britain several times after being married and subjected to threats of FGM without ever seeking asylum from either of these countries. *Compare In re Kasinga*, 21 I. & N. Dec. 357, 359, 1996 WL 379826 (BIA 1996) (en banc) ("The applicant did not attempt a fraudulent entry into the United States. Rather, upon arrival at Newark International Airport on December 17, 1994, she immediately requested asylum.").[11] Indeed, not only did Ms.

---

[10] Ms. Balogun's brief to this court argues that the IJ's reasons for its adverse credibility determination are not "specific" or "cogent" enough to allow her "to meet the IJ's adverse credibility determination on appeal." Petitioner's Br. at 21. Therefore, she argues, her due process rights have been violated. *Id.* (citing *Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 660 (9th Cir. 2003)). The IJ's credibility findings were stated adequately; they do not implicate due process concerns.

[11] In *In re Kasinga*, 21 I. & N. Dec. 357, 1996 WL 379826 (BIA 1996) (en banc), the BIA held that a nineteen-year-old applicant estab-
(continued...)

Balogun not seek asylum, but the IJ found that she never expressed a fear of being forced to undergo FGM to anyone on her trips to the United States. Ms. Balogun testified that she expressed her fear to her cousins in Ohio; however, the IJ did not credit that claim because Ms. Balogun lacked corroboration. A.R. 43 (noting that the cousins "have not testified nor presented any statement" and Ms. Balogun "hasn't explained what effort, if any, she has made to obtain such statement where her cousins are in Ohio"). As we discuss further *infra*, in this case, we cannot fault this use of the corroboration rule to discredit this claim.

Perhaps most damaging to Ms. Balogun's credibility, when she was detained at O'Hare on her third attempted trip into the United States in December of 1999, Ms. Balogun was specifically asked at her airport interview whether she had "any fear or concern about being returned" to Nigeria and whether she would be harmed if she returned to Nigeria, to which she replied: "I don't know" and "[m]aybe." *Id.* at 348; *see Ramsameachire v. Ashcroft*, 357 F.3d

---

[11] (...continued)
lished a well-founded fear that her aunt and forty-five-year-old husband would force her to undergo FGM if she returned to Togo. In this case, the IJ explained that Ms. Balogun's personal and family situation is in "sharp contrast" to the applicant in *Kasinga* because Ms. Balogun is a mature, university-educated woman who is "now married to a man who is not from her tribe." A.R. 47. This is an important distinction from *Kasinga*. However, the critical distinction between *Kasinga* and this case is that the BIA found the applicant in *Kasinga* to be credible. *See In re Kasinga*, 21 I. & N. Dec. at 365. Here, the IJ did not, and, as we discuss further *infra*, we cannot hold that the record compels a different result. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) ("To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it . . . .").

169, 180-81 (2d Cir. 2004) ("Where the alien's airport statements and his or her later testimony present materially different accounts of his or her purported persecution, however, the inconsistencies may render the alien's testimony incredible.").

Ms. Balogun offered a series of explanations for these "timing" factors. She explained that, on her first trip to the United States, she believed that, when she returned home, her relatives would have relented. She explained that, on her second trip, she was still under the assumption her father would intervene to prevent his relatives from forcing her to undergo FGM. Finally, she explained that, on her third trip to the United States—the trip after her father told her he would not help her—she told the immigration officials that she was not sure if she had fear of returning to Nigeria because she was nervous. Furthermore, she emphasized that FGM was something she was reluctant to discuss. Although we believe these explanations might be regarded as plausible, the IJ, looking at them cumulatively, did not. We cannot say that the record *commands* a different result. *See* 8 U.S.C. § 1252(b)(4)(B) (explaining that factual findings, such as credibility, "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary").

We have deferred our discussion of the corroboration rule in this circumstance to the end of our inquiry into this factor because it requires a more elaborate discussion. Corroboration can arise in a number of contexts. First, it comes into play when the IJ has determined that the petitioner's testimony, standing alone, is credible. In this context, 8 C.F.R. § 208.13(a) explains that "[t]he testimony of the applicant, if credible, *may* be sufficient to sustain the burden of proof without corroboration." (emphasis added). The BIA has interpreted this regulation to mean that, indeed,

credible testimony alone *may* be sufficient; "[h]owever, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided" to support the testimony and failure to supplement the testimony with corroborating evidence under these circumstances "can lead to a finding that an applicant has failed to meet her burden of proof." *In re S-M-J-*, 21 I. & N. Dec. 722, 725-26, 1997 WL 80984 (BIA 1997) (en banc).[12]

Corroborative evidence also may be important when the IJ has yet to assess definitively the credibility of the petitioner. The situation can present itself in at least two different contexts. In certain circumstances, the IJ may determine that the failure of the petitioner to present certain foundational evidence that is reasonably available to the petitioner casts such a cloud on the testimony offered by the petitioner as to require a determination that the testimony is incredible. In these circumstances, the IJ must, of course, exercise great prudence in determining what can be expected of the petitioner in the circumstances presented by the case. For instance, conditions in another country or the economic circumstances of the petitioner may render unreasonable what might be considered very reasonable and therefore expected in typical domestic civil litigation. In

---

[12] The Ninth Circuit has rejected this interpretation, *see Ladha v. INS*, 215 F.3d 889, 901 (9th Cir. 2000) ("[A]n alien's testimony, if unrefuted and credible, direct and specific, is sufficient to establish the facts testified without the need for any corroboration."), while other circuits have accepted the BIA's interpretation, *see, e.g., Kayembe v. Ashcroft*, 334 F.3d 231, 238 (3d Cir. 2003). As we noted in *Capric v. Ashcroft*, 355 F.3d 1075, 1085, 1086 n.4 (7th Cir. 2004), we have not yet had occasion to decide this matter in a definitive way.

reviewing the need for corroboration, the BIA and this court must guard against reliance on hindsight in assessing the IJ's determination.

Corroboration also can be important when, for any reason, the IJ determines that the testimony of the petitioner, while not mendacious, cannot be accepted at face value. It is not necessary to determine that the petitioner has lied in order to decline to accept that person's version of events. As in the case of all witnesses in any kind of proceeding, time and circumstances may have caused the petitioner's memory to be less than accurate, or the situation may not have afforded the petitioner an opportunity to obtain a global perspective. Infirmity, injury or emotion may have taken its toll on the individual's perspective. In any of these situations, the IJ must turn to the entire record to determine whether, despite an impaired perspective, the petitioner nevertheless has made out a sufficient case.

The corroboration requirement—especially the corroboration requirement of the second variety—is becoming a staple in these types of immigration cases. *See, e.g., Capric,* 355 F.3d at 1091. No matter what form of corroboration is at issue, the corroboration requirement should be employed reasonably. It is always possible to second-guess the petitioner as to what evidence would be most cogent, and, consequently, there is a distinct danger that, in practice, the corroboration requirement can slip into "could have-should have" speculation about what evidence the applicant could have brought in a text-book environment. The IJs need to take to heart the BIA's blunt admonition that corroboration should be required only as to "material facts" and only when the corroborative evidence is reasonably accessible. *In re S-M-J-,* 21 I. & N. Dec. 722, 725, 1997 WL 80984 (BIA 1997) (en banc).

In this case, the corroboration sought was "material" to Ms. Balogun's case. An obvious problem for Ms. Balogun's claimed fear is that she articulated it only when faced with a concrete threat of deportation. Ms. Balogun had been to Britain and the United States on multiple occasions *after* the prospect of her having to submit to the ordeal of FGM developed. Nevertheless, she never sought asylum, and, according to Ms. Balogun, the only person she told of her fear of FGM was a cousin. The government's cross-examination then called even that into question:

> Q. Did you tell anybody about your circumcision threats when you were here in May?
>
> A. I told my cousins.
>
> . . . .
>
> Q. And were do they live? Where does she live?
>
> A. She lives in Columbus.
>
> Q. Okay. Did she come to Court today?
>
> A. No.
>
> Q. Did she submit an affidavit?
>
> A. No.

A.R. 117-18. Despite the fact that her cousin (or cousins) could validate her fears and rebut the government's suggestion that Ms. Balogun's alleged fears were simply a last-minute effort to avoid deportation, Ms. Balogun offered no explanation to the IJ as to why her live testimony or affidavits were unattainable. In this circumstance, we cannot say the IJ was not justified in giving some weight to the lack of corroboration in its adverse credibility determination.

### 2. Family History

The next factor upon which the IJ relied was Ms. Balogun's professed ignorance as to whether her mother or sister had undergone FGM. The inference, of course, is that, if she does not know if her own family members had undergone FGM, then it is questionable as to whether she would be expected to—much less forced to—undergo FGM. This inference is questionable with respect to her eighteen-year-old sister: Ms. Balogun consistently explained that, in her village, FGM occurred *after* a woman is married and her sister is unmarried. With respect to her mother, however, in assessing the petitioner's credibility, the IJ was entitled to give some weight to the petitioner's assertion that she was unaware whether her own mother, with whom she alleg-edly communicated on numerous occasions about FGM after she was married, had undergone FGM. It is true, as Ms. Balogun notes, that a letter from "Mum" in the evidence states that her father's "mother and sisters went through it." A.R. 273-74. Ms. Balogun also claims that FGM was not something talked about among her family. Nevertheless, after reviewing her testimony on this point, *see, e.g., id.* at 109-13, and noting that, in fact, she did communicate with her mother about FGM, we cannot say that a reasonable trier of fact would have to find her explanation plausible.

### 3. Past Credibility

Finally, the IJ relied on Ms. Balogun's "past credibility," by which he was referring to her misrepresentations at her airport interview on her last trip in December of 1999 into the United States. At this interview, Ms. Balogun misrep-resented that a photograph of her husband that she had in her possession was her boyfriend, and she also falsely claimed that she was estranged from her husband. Further,

she misrepresented that her purpose in a prior trip to the United States was to buy things to sell in her country, and also misrepresented that her current trip was for the same purpose. The IJ held that these inconsistencies, while not directly connected to the heart of her alleged fear of pers-ecution, "show a propensity to dissemble and to distort the truth when the need arises" and are "relevant in a case where the respondent is essentially asking the Court to accept her account at face value." A.R. 46.

Inconsistencies that do not relate to the basis of the ap-plicant's alleged fear of persecution are less probative than inconsistencies that do. *See Capric*, 355 F.3d at 1075. Never-theless, multiple misrepresentations to Agency officials can serve as *a factor* in the credibility calculus; lying in a sworn statement is not irrelevant to credibility. The IJ did not seize on a few omitted details to conjure up an inconsistency; Ms. Balogun's misrepresentations were numerous and apparent. *Cf. Lopez-Reyes v. INS*, 79 F.3d 908, 911 (9th Cir. 1996) (explaining that an "applicant's testimony is not per se lacking in credibility simply because it includes details that are not set forth in the asylum application"); *Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir. 1986) (holding that minor discrepancies in birth dates of children between the applica-tion and oral testimony were "trivial" errors that did not reflect on the petitioner's credibility, especially when the applicant had no motivation to misrepresent those dates). This also is not a case in which the adverse credibility determination rests *solely* on inconsistencies that do not go to the heart of the petitioner's case; rather, the IJ justifiably set these misrepresentations against the backdrop of the whole record and considered them as one factor in his credibility determination. *See Secaida-Rosales v. INS*, 331 F.3d 297, 308 (2d Cir. 2003) (explaining that the impact of "outright inconsistencies" and "omissions" must "be measured against the whole record before they may justify

an adverse credibility determination"). Finally, the IJ's refusal to credit Ms. Balogun's explanations for these misrepresentations—that she was nervous—is justified. Ms. Balogun's own testimony at the merits hearing reveals that these misrepresentations were calculated attempts to mislead the immigration officials. *See* A.R. 105 (explaining that she lied about her purpose in entering the United States because "I didn't want to tell them I was working, because I knew I wasn't supposed to be working"); *id.* at 124 (explaining that she lied about her husband because "I was just picked up from the airport, and I was scared that they were going to pick him up too").

Ms. Balogun challenges whether the IJ may rely on the airport interview *at all*. She claims that the transcript from the interview in the record is unreliable. The airport interview is more than the basis of the "past credibility" factor. It also is the source of the most damaging evidence, cited in the "timing" factor, that, at her airport interview, she was asked whether she had any fear of returning to Nigeria or any reason to believe she would be harmed if she returned to Nigeria, and she responded: "[m]aybe" and "I don't know." *Id.* at 348.

The Second Circuit recently synthesized the case law on the probative value and reliability of airport interviews in subsequent immigration proceedings. *See Ramsameachire v. Ashcroft*, 357 F.3d 169 (2d Cir. 2004). As *Ramsameachire* and numerous other cases explain, airport interviews only are useful and probative if they are reliable. *Id.* at 179-81 (discussing cases). Reliability concerns not only the accuracy and validity of the documents on which airport interviews are recorded, but also the applicant's frame of mind and ability to answer the interviewer's questions. *Id.* For example, if there are language barriers or if the applicant has a reasonable fear of governmental authority (perhaps because

the applicant recently has been subjected to governmental abuse or coercion), then evasive answers on the question of fear of persecution would not be a reliable indicator of a true lack of fear. *See id.* The Second Circuit set out a useful, non-exclusive list of factors to consider in the reliability equation:

> First, a record of the interview that merely summarizes or paraphrases the alien's statements is inherently less reliable than a verbatim account or transcript. Second, similarly less reliable are interviews in which the questions asked are not designed to elicit the details of an asylum claim, or the INS officer fails to ask follow-up questions that would aid the alien in developing his or her account. Third, an interview may be deemed less reliable if the alien appears to have been reluctant to reveal information to INS officials because of prior interrogation sessions or other coercive experiences in his or her home country. Finally, if the alien's answers to the questions posed suggest that the alien did not understand English or the translations provided by the interpreter, the alien's statements should be considered less reliable. Examining the interview in light of these factors will focus the agency's inquiry on whether the record of the interview accurately reflects the alien's statements, whether the alien had a full opportunity to express him- or herself, and whether the alien's statements are likely to reflect his or her actual beliefs and fears.

*Id.* at 180 (internal quotation marks and citations omitted).

Ms. Balogun's first key challenge to the transcript is that, on the first page of the transcript, she is incorrectly identified as a "male." A.R. 344. Ms. Balogun's second key challenge is that the date on the transcript is December 13, 1999, *id.*, and this is "a whole day off" from the date of her actual arrival, Petitioner's Br. at 16. It is obvious that these were

minor clerical errors—for example, the question and answer portion of the transcript reveals that there was, in fact, no confusion regarding Ms. Balogun's gender, *see* A.R. 345—and, on this record, these errors do not call into serious question the reliability of the airport interview. Any concern that we might have about the transcript reflecting the substance of the interview is relieved by the fact that Ms. Balogun did not object to this document's admission into evidence. Moreover, at the merits hearing, she did not dispute as inaccurate her recorded representations (and misrepresentations); indeed, she openly admitted many of them. *See id.* at 105 (admitting that she lied about entering the country to buy things to sell in Nigeria); *id.* at 124-25 (admitting that she lied about her husband). Even on this appeal, she does not challenge as falsely recorded or untrue the representations and misrepresentations relied upon by the IJ.

Moreover, the record reveals that Ms. Balogun is a well-educated, mature woman who speaks adequate English. The transcript was sworn and subscribed as true and correct; Ms. Balogun signed not only the last page indicating her belief "this statement is a full, true and correct record of my interrogation," but she also initialed each page. *Id.* at 348. Nothing suggests that she did not completely understand the questions or the consequences resulting from her answers.[13] The transcript is typed in a "Q." and "A." for-

---

[13] Before the "Q." and "A." section, Ms. Balogun was informed that, if she lied or gave misinformation, she could be "subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future." A.R. 344. She was also told that, if she had a fear of returning home due to harm or persecution, she should so state during the interview, and that "[y]ou will have the opportunity to speak privately and confiden-
(continued...)

mat. At the end of her interview—immediately after she was asked if she had any concern about being returned to her home country or if she would be harmed if she returned and responded "[m]aybe" and "I don't know"—she was asked: "Do you have any questions or is there anything else you would like to add?" *Id.* at 348. Her only response was: "Can I stay for a year[?]" *Id.* Although Ms. Balogun stated that she was understandably nervous at this interview, she did not suggest that any form of coercive technique was used, and the record does not support that she has been subject to any such techniques at any point in the past. Given all these factors, we are confident that the airport interview, and the transcript of it in the record, are reliable and probative of Ms. Balogun's true fear.[14]

_____

[13] (...continued)
tially to another officer about your fear or concern. The officer will determine if you should remain in the United States and not be removed because of fear." *Id.* She was informed that "[a]ny statement you make may be used against you in this or any subsequent administrative proceeding." *Id.* She was then asked:

    Q.  Do you understand what I've said to you?

    A.  Yes

    Q.  Do you have any questions?

    A.  No

    Q.  Are you willing to answer my questions at this time?

    A.  Yes

*Id.*

[14] Ms. Balogun also suggests that the transcript of the airport interview was not admitted into evidence and was stricken or withdrawn. Given that her counsel voiced no objection to the admittance of the transcript, both counsel questioned her on the transcript during the merits hearing, and then the IJ relied on the
(continued...)

### 4. Other Documentary Evidence

We now turn our attention to the other documentary evidence in this case, the most important of which, according to Ms. Balogun, are the reports on the state of FGM in Nigeria and the March 18, 2001 letter from Ms. Balogun's mother. Although the IJ focused on the three factors analyzed above in making his adverse credibility determination, he did not ignore these other pieces of evidence. As to the reports on FGM in Nigeria, the IJ noted that, although these reports demonstrate that FGM continues to be a "problem" in Nigeria, they do "not provide the sort of support that the respondent has contended." A.R. 47. Ms. Balogun has again relied extensively on these reports in this court. Although we agree that these reports reveal that FGM is not just a "problem," but a serious one, *see Nwaokolo v. INS*, 314 F.3d 303, 308-10 (7th Cir. 2002), we nevertheless must conclude that the IJ treated these reports adequately in this case.

The latest Department of State Country Report in the record is from 2000, and it notes two studies that put the incidence of FGM in Nigeria at approximately fifty and sixty percent, respectively. A.R. 255. Ms. Balogun notes that, in *Nwaokolo*, we noted that the incidence of FGM has been reported as high as ninety percent. 314 F.3d at 308. However, a June 1, 2001 State Department Report or Bulletin on FGM in Nigeria which is cited in *Nwaokolo* and which we may take judicial notice of, *id.*, puts the incidence of FGM in

---

[14] (...continued)
transcript in his adverse credibility determination, her suggestion is obviously without foundation. Finally, Ms. Balogun suggests that the IJ's reliance on the transcript violated her due process rights; this too is patently without merit, especially given that no objection was voiced to its admission into evidence.

Ogun State—where Ms. Balogun is from and where she claims the source of her threat arises—at thirty-five to forty-five percent. *See* Nigeria: Report on Female Genital Mutilation (FGM) or Female Genital Cutting (FGC), June 1, 2001, Dep't St. Bull., *available at* http:/www.state.gov/g/ wi/rls/rep/crfgm/10106.htm. This is much more probative than the national figures cited, given that the incidence of FGM often varies significantly from state to state.[15] *See id.* Moreover, as the IJ noted, the 2000 Country Report, and other reports in the record, indicate that the incidence of FGM is declining and that Ogun is one of the states to have outlawed FGM. *See, e.g.*, A.R. 255 (State Department 2000 Country Report). Although other facts in these reports support Ms. Balogun's claim and the continuing problem of FGM in Nigeria generally, *see id.* (noting that state-imposed punishments for FGM are "minimal"), we cannot say that the IJ exceeded his bounds in interpreting these reports and applying them to the situation of this particular applicant. *Cf. Gonazelez-Hernandez v. Ashcroft*, 336 F.3d 995, 1000 (9th Cir. 2003) ("[W]here the BIA rationally construes an ambiguous or somewhat contradictory country report and provides an 'individualized analysis of how changed conditions will affect the specific petitioner's situation,' *Borja v. INS*, 175 F.3d 732, 738 (9th Cir. 1999) (en banc)

---

[15] The June 1, 2001 Bulletin on FGM in Nigeria noted in *Nwaokolo v. INS*, 314 F.3d 303, 308 (7th Cir. 2002), was issued just weeks before the IJ's decision, and *Nwaokolo* was issued well after the IJ's decision. The IJ apparently did not have the June 1, 2001 Bulletin before him when he made his decision, and we do not mean to imply that his findings were inadequate without it. We note the June 1, 2001 Bulletin and its findings because Ms. Balogun relies heavily upon *Nwaokolo*, which in turn relies upon this Bulletin, on this appeal and because it is important to our discussion.

(citation and internal quotation marks omitted), substantial evidence will support the agency determination."). The IJ was certainly within the substantial evidence boundary in determining that, while relevant, these reports could not revive the applicant's credibility. *See In re S-M-J-*, 21 I. & N. Dec. 722, 729, 1997 WL 80984 (BIA 1997) (en banc) ("Adverse credibility determinations are appropriately based on inconsistent statements, contradictory evidence, and inherently improbable testimony; and where these circumstances exist in view of the background evidence on country conditions, it is appropriate for an Immigration Judge to make an adverse credibility determination on such a basis.").

The same rationale applies to the other piece of documentary evidence upon which Ms. Balogun extensively relies: the March 18, 2001 letter from "Mum," which states, inter alia, that the "elders keep asking when you are coming back to perform the traditional rites." A.R. 273-74. The IJ noted the letter, but he clearly believed that it could not overcome the other "very disturbing aspects of the respondent's credibility in this case." *Id.* at 43. We agree with Ms. Balogun that this letter supported her claim by helping to corroborate her story, but it is not the type of evidence which, in the face of the other evidence and the IJ's findings, would allow us to overturn the IJ's decision.

This case, like so many asylum cases, has a record which plausibly *could* support two results: the one the IJ chose and the one Ms. Balogun advances. Nevertheless, for this court "[t]o reverse the BIA [or IJ] finding we must find that the evidence not only *supports* [the opposite] conclusion, but *compels* it." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). The IJ found Ms. Balogun's claim of fear to be incredible, and he cited specific, cogent reasons that bore a legitimate nexus to that finding. Because the evidence does not *compel*

a different result, we must affirm the IJ's denial of Ms. Balogun's asylum claim, and the BIA's summary affirmance of the IJ's decision.

## C. Withholding of Removal

Section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), provides that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." In order to gain relief under this Section, "the applicant must demonstrate a clear probability of persecution," which is "a much more demanding burden" than is found in the asylum context. *Capric*, 355 F.3d at 1095. Therefore, as we have often said, "if an applicant's asylum claim fails, his withholding of deportation claim will also necessarily fail." *Id.* Because we have held that the IJ's decision denying Ms. Balogun's asylum relief must be upheld, we must also uphold his decision denying Ms. Balogun's claim for withholding of deportation.

## Conclusion

For the foregoing reasons, the petition for review is denied, and the judgment of the BIA is affirmed.

PETITION FOR REVIEW DENIED; AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*