UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 13, 2006
Decided July 11, 2006

**Before**

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. KENNETH F. RIPPLE, *Circuit Judge*

No. 05-3301

| | |
|---|---|
| ANTHONY AKAWARANDU JOHNSON, *Petitioner*, | Petition for Review of an Order of the Board of Immigration Appeals |
| v. | No. A79-787-961 |
| ALBERTO R. GONZALES, *Respondent*. | |

**O R D E R**

Anthony Akawarandu Johnson applied for asylum claiming that he cannot return to his native Nigeria because his Catholic faith puts him at odds with militant Muslims in the north part of the country and with a secret "occult society" that is trying to recruit him in the south. The Immigration Judge ("IJ") found him not credible and denied his application, and the Board of Immigration Appeals ("BIA") affirmed. For the reasons set forth in the following order, we deny the petition for review.

# I

# BACKGROUND

Mr. Johnson was caught entering the United States on foot at San Ysidro, California, in May 2002. Initially, he claimed to be a citizen of the United States and presented what appeared to be a California driver's license. Eventually, he admitted that he was from Nigeria. Mr. Johnson then was turned over to enforcement officers, who elicited a sworn statement that differs significantly from the story he would later tell the IJ. At the border, Mr. Johnson said that he went to the United Kingdom as a student in 1988 but made his way to the United States in 1990 and had been living here illegally ever since. He said that he was residing in Los Angeles, and just visiting Tijuana. Mr. Johnson was warned that this interview might be his one chance to express any fear or concern about being removed from the United States, and he was told that, if he lied, he could be barred from receiving immigration benefits. Nevertheless, he told the interviewers that he did not believe he would be harmed if he returned to Nigeria. Mr. Johnson made no allusion to his father or brother's having been killed in a Muslim uprising. Nor did he mention his fear of reprisal for defying a secret society. Mr. Johnson, who speaks English fluently, initialed every page of his statement.

Despite this statement, Mr. Johnson was not turned away at the border. The following month, an immigration officer decided that he had a credible fear of returning to Nigeria. The IJ found this determination "incongruous" and asked the government's counsel to explain it, but counsel could say only that the referral process is "not always the most accurate." A.R. at 67-69. The administrative record includes the transcript of what may have been Mr. Johnson's credible-fear interview. The IJ observed that this document "would establish further inconsistencies" in Mr. Johnson's story, but elected to ignore it in evaluating Mr. Johnson's credibility largely because the transcript is undated and does not identify either the interviewer or Mr. Johnson by name. *Id.* We likewise have disregarded the transcript. As far as this record shows, Mr. Johnson's account of his past as told in his appellate brief first emerged in January 2003 when he filed his asylum application with the help of his current counsel. The details that follow are derived from his asylum application and from his testimony before the IJ.

## A. Facts

The story underlying Mr. Johnson's asylum claim begins in 1991 when, according to his statement at San Ysidro, he already was living in the United States. Mr. Johnson related that he resided in Jos, a city in central Nigeria inhabited by both Muslims and Christians. In August 1991, according to Mr.

Johnson, a proposal to introduce Shari'a law sparked violence between Christians and Muslims. Mr. Johnson's father was targeted because he was well known as a leader of a Catholic religious society. Mr. Johnson testified that Muslims beat his father and burned his house, killing both his father and one of Mr. Johnson's brothers. Mr. Johnson said that he was not at home at the time, and then gave three different answers when the IJ wanted to know how he knew the attackers were Muslims. Mr. Johnson initially said he knew because the attack happened at a time of "religious crisis." *Id.* at 147. Then, when pressed to elaborate, he added that he arrived in time to see Muslims, whom he identified by their turbans, fleeing his father's house. He also said he heard from bystanders what had happened. Later, under cross-examination, he claimed that he actually saw a Muslim start the fire.

Mr. Johnson recounted that, after this attack, he and his family tried to bury his father in Umuahia, the city in southeastern Nigeria where his father was born. However, they met with interference from a local cult called "Mboko," whose members resented that Mr. Johnson's father had left the village and flouted the requirement that every first-born male in the community join the cult. Mr. Johnson obtained police protection and succeeded in burying his father, but the Mboko cult then shifted its attention to him. Eight to ten elders came to his house one morning and insisted that he join in place of his father. Mr. Johnson was unwilling to join, he said, because the initiation rite of sacrificing the heart of a newborn baby offended his Christian beliefs, and he feared being castrated if he refused to comply with the initiation rite. He contacted the police, but was told to solve this "family problem" himself or appeal to a local chief (who belonged to the Mboko). *Id.* at 125-26.

Mr. Johnson then moved to Lagos in southwestern Nigeria with financial assistance from his church. However, within a few years, he claimed, the cult had discovered his whereabouts. In May 1994, a member of the Mboko cult confronted him outside his house and asked when he was coming for his initiation. Mr. Johnson's asylum application mentions only this one encounter, but he told the IJ that the same man appeared again a month later, accompanied by another member of the cult. Mr. Johnson testified that he told the men he was coming home for his initiation, but instead he fled again, this time to Zimbabwe.

For the next eight years, in this version of the story, Mr. Johnson lived in Zimbabwe. In 1996, he accepted a supervisory position on a large farm, and the following year he married a Zimbabwean school teacher. The couple later had a son. Eventually, however, Zimbabwe also became dangerous. He testified that he was harassed, and on one occasion beaten, by land-redistribution advocates who believed that he sympathized with the wealthy, white landowners. In March 2002, the owner of the farm where he worked was abducted and murdered. At that point,

he decided to come to the United States.  He first went to Mexico, where he spent four weeks with one of his brothers before crossing into the United States.

Mr. Johnson tried to corroborate his testimony with death certificates for his father and brother stating that they died from "injur[ies] sustained during crisis," *Id.* at 281-82; letters from his sisters in Nigeria, written after he filed his asylum application, that asserted that members of the Mboko continued to ask about him; reports from Human Rights Watch on the violence between Muslims and Christians in Jos in 2001; and a news story reporting the death of Mr. Johnson's alleged former employer in Zimbabwe.  Later, after the IJ requested further corroboration, Mr. Johnson submitted additional materials, including an article by a professor at the University of Calabar in southeastern Nigeria that mentions a local deity called Mboko.  We note, however, that the article does little to support Mr. Johnson's testimony.  First, it is unreliable as an authority because it contains no date or volume number that could be used to verify its publication, and it cites no source for its factual representations.  Second, although it alludes to the basic themes of Mr. Johnson's testimony about the Mboko--first-born sons, castration, sacrificing the heart of an infant--the article describes an entirely different relationship between these factors.  The article does not confirm that all first-born sons must join the cult under penalty of castration; rather, it describes a tradition in which one among them is chosen to serve as a sacrificial priest in a forest shrine.  It does say that the chosen one will be castrated if he refuses to serve, but Mr. Johnson does not contend that he was chosen to be a priest.  And the article states that the heart of an infant is required as a sacrifice, if the chosen son refuses to serve; it does not mention any initiation rite.

## B.  Agency Decisions

After examining all of the foregoing evidence, the IJ concluded that Mr. Johnson was ineligible for asylum under 8 U.S.C. § 1158(b)(2)(A)(vi) because, by living and working in Zimbabwe for eight years and establishing his family there, he had "firmly resettled" in that country.  In the alternative the IJ found Mr. Johnson not credible because of the multiple inconsistencies in his testimony.  First, the IJ noted the "marked difference" between the sworn statement Mr. Johnson gave at the border and his later testimony at his asylum hearing with respect to the crucial issues of (1) where he had been since 1988, (2) why he left Nigeria, and (3) whether he feared being harmed on return.  A.R. at 49.  Second, the IJ observed that Mr. Johnson's testimony on direct examination that he was not present when Muslims set fire to his house was inconsistent with his assertion on cross-examination that he actually saw someone start the fire.  Third, the IJ pointed out that, at the hearing, Mr. Johnson testified he was visited twice by members of the Mboko cult during his last months in Lagos, while in the statement appended to his

asylum application he mentioned only one visit. The IJ went on to conclude that Mr. Johnson failed to provide adequate corroboration of his testimony. Although the IJ accepted the death certificates as evidence that Mr. Johnson's father and brother died in 1991, he held that Mr. Johnson failed to demonstrate they were killed by Muslims on account of their religious beliefs. The IJ also accepted the article from the professor at the University of Calabar as evidence that the Mboko cult exists, but he concluded that Mr. Johnson failed to show he was likely to be castrated for refusing to join the cult or that the police were unwilling or unable to protect him. Because of his adverse credibility finding, the IJ also found that Mr. Johnson did not meet his burden of proof for his claim to withholding of removal.

The BIA, citing *Diallo v. Ashcroft*, 381 F.3d 687 (7th Cir. 2004), concluded that the IJ erred in ruling that Mr. Johnson had firmly resettled in Zimbabwe. The BIA nonetheless upheld the adverse credibility determination and thus affirmed the denial of Mr. Johnson's asylum application.

## II

## DISCUSSION

Because the Government does not challenge the BIA's ruling on firm resettlement, we address only the question of credibility. The BIA recited several of the reasons given by the IJ for his credibility determination, but still essentially adopted the IJ's decision. Accordingly, we review the IJ's decision as if it were that of the BIA. *See Feto v. Gonzales*, 433 F.3d 907, 911 (7th Cir. 2006).

We shall uphold the adverse credibility determination if it is supported by substantial evidence. *Kllokoqi v. Gonzales*, 439 F.3d 336, 341 (7th Cir. 2005). The IJ's decision is entitled to particular deference, as long as it is supported by "specific, cogent reasons" with a "legitimate nexus to the finding." *Id.* (internal citations and quotation marks omitted); *see Shtaro v. Gonzales*, 435 F.3d 711, 715 (7th Cir. 2006). We may not reverse the IJ's ruling unless the record compels a different result. *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004).

Mr. Johnson contends that the adverse credibility determination lacks cogency because, in his view, all of the inconsistencies the IJ identified are either minor or immaterial to his claims. *See Kllokoqi*, 439 F.3d at 341-42 (holding that adverse credibility determination cannot be supported by inconsistencies that do not involve the heart of petitioner's claim); *Shtaro*, 435 F.3d at 716 (refusing to uphold adverse credibility determination where discrepancies were minor or easily

explained).[1] Mr. Johnson, first somewhat puzzlingly, argues that the IJ erred in finding inconsistency based on his claim to be a United States citizen during his first immigration inspection and his use of a fraudulent passport.[2] These arguments miss their mark because the IJ did not base his credibility determination on either consideration. In fact, he did not even discuss the relevance of the passport or the citizenship claim to his determination. As he makes clear in his opinion, the only evidence from the time of entry upon which he relied was Mr. Johnson's sworn statement.

There is no doubt that the IJ was within his rights to rely on the sworn statement. An "airport interview" may support an adverse credibility determination so long as it is reliable, *see Jamal-Daoud v. Gonzales*, 403 F.3d 918, 924 (7th Cir. 2005); *Balogun*, 374 F.3d at 504-05, and the record of the interview in this case has all of the indicia of reliability we recognized as useful in *Balogun*, *see id.* at 504-05 (citing *Ramsameachire v. Ashcroft*, 357 F.3d 169, 180 (2d Cir. 2004)). The transcript of the interview at San Ysidro includes all of the questions Mr. Johnson was asked as well as his answers. There is no reason to think that his past experiences would cause him to mistrust the inspectors. There was no potential error in translation because Mr. Johnson spoke English. Most important, Mr. Johnson was asked three questions that were specifically designed to elicit information relevant to an asylum claim. First, he was asked if he had any "fear or concern about being returned" to his home country; next, he was asked if he would "be harmed" if he was returned; finally, he was asked if he had anything further to add to his statement. A.R. at 371. He said "no" to all three questions.

The discrepancies between Mr. Johnson's sworn statement at the border and his later testimony are not immaterial. Even if they were immaterial, however, the IJ still might permissibly draw a negative inference about his truthfulness because "lying in a sworn statement is not irrelevant to credibility." *Balogun*, 374 F.3d at 504. Mr. Johnson now concedes that he lied to the immigration officers, and the

---

[1] Under the new standards enacted last May in the REAL ID Act of 2005, *see* Pub. L. No. 109-13, 119 Stat. 231, inconsistencies no longer must "go[] to the heart of the applicant's claim," *id.* at § 101(a)(3). Mr. Johnson, however, receives the benefit of the old standard because the new credibility standards in this section apply only to petitions for asylum made on or after May 11, 2005. *See id.* at § 101(h)(2). *See also Diallo v. Gonzales*, 439 F.3d 764, 766 n.1 (7th Cir. 2006); *Dawoud v. Gonzales*, 424 F.3d 608, 613 (7th Cir. 2005).

[2] Presumably, Mr. Johnson is referring to the passport he used to enter Zimbabwe because there is no evidence that he used a passport to enter the United States.

only explanation he offers--that he thought he was still in Mexico--is frivolous given that he was told he was speaking with officers of the United States and that the statement he initialed is a form captioned with "U.S. Department of Immigration and Naturalization Service." A.R. at 369.

Mr. Johnson also criticizes the IJ's finding that he testified inconsistently about whether he saw the purported attack on his father's house. He does not explain, however, how we can reconcile his testimony on direct examination that he was not present during the attack with his insistence on cross-examination that he actually saw the Muslims set fire to his father's house. These two accounts are, as the IJ noted, inconsistent.

Mr. Johnson next contends that the number of times he was visited by the Mboko in Lagos is "not material" to his asylum claim, but he makes no attempt to explain why. His testimony that there was a second visit may not be *necessary* to his asylum claim, but, given his failure to mention a second visit in his counseled asylum application, the IJ did not unreasonably view the allegation as an on-the-spot invention to enhance his claim that the Mboko were aggressively targeting him. We cannot say that the IJ erred in finding this discrepancy material.

Mr. Johnson further argues that the IJ erred in requiring corroboration of his testimony, but there is no room for dispute about the appropriateness of the IJ's asking for corroboration when the petitioner's credibility is in doubt, as it was here. *See Dawoud v. Gonzales*, 424 F.3d 608, 613 (7th Cir. 2005). Mr. Johnson proposes that he should be excused from corroborating his testimony, at least with respect to the Mboko, because "testimony regarding the activities of a secret cult is not subject to verification." Appellant's Br. at 15. However, the IJ did not require him to corroborate testimony about a secret ritual or some unique experience he had. The IJ was looking for the sort of evidence that would have been public knowledge had it existed: evidence that infants were killed for their hearts or that first-born sons who refused to join the cult were castrated.

There is also a more fundamental problem in that Mr. Johnson's purported fear lacks any visible source or cause. He testified that he feared the Mboko would castrate him, but he never offered any explanation for that fear. When the government's counsel asked how many people had been castrated for refusing to join the cult, Mr. Johnson mentioned that his sister told him of one castration in the village where his mother lived. But that castration occurred only a year before his asylum hearing. Even if the account is true, it could not justify his flight from Nigeria in 1994. There is no evidence to suggest that anyone who lived outside the village was ever castrated. We note that Mr. Johnson's father, despite his defiance of the cult, was never castrated, nor was Mr. Johnson's older brother, who was a "first-born son" before he was killed in an industrial accident. Under these

circumstances, the IJ did not err in requiring some corroboration of Mr. Johnson's fear of the Mboko.

Finally, Mr. Johnson argues that, under our decision in *Georgis v. Ashcroft*, 328 F.3d 962 (7th Cir. 2003), it was impermissible for the IJ to fault him for failing to provide corroboration of his claims about the Mboko because the IJ "refused to consider" his evidence, namely the article from the professor from the University of Calabar. But this argument is mistaken on two grounds. First, *Georgis* forbids the IJ to count a failure to corroborate only where the evidence demanded was excluded because it was not authenticated. *See Georgis*, 328 F.3d at 969. Here, the IJ did not reject the article from the University of Calabar because of a lack of authentication, so *Georgis* has no application. Second, the IJ did not "refuse to consider" the article. As he explains in his opinion, he simply found it inadequate to corroborate Mr. Johnson's testimony. For the reasons we gave when we noted the submission of the article, we find no fault with that determination.

## Conclusion

For the foregoing reasons, we deny the petition for review.

PETITION DENIED