# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-2305

LOAAE JAMAL-DAOUD,

*Petitioner*,

v.

ALBERTO R. GONZALES, United States
Attorney General,

*Respondent.*

———————

**Petition for Review of an Order
of the Board of Immigration Appeals.
No. A 77 650 669**

———————

ARGUED JANUARY 12, 2005—DECIDED APRIL 12, 2005

———————

Before FLAUM, *Chief Judge*, and EASTERBROOK and WOOD,
*Circuit Judges*.

FLAUM, *Chief Judge*. Petitioner Loaae Jamal-Daoud, a
native and citizen of Iraq, petitions this Court for review of
an order of the Board of Immigration Appeals ("BIA")
denying his requests for asylum, withholding of removal,
and protection under the Convention Against Torture
("CAT"). For the reasons stated herein, we affirm the order
of the BIA.

## I. Background

Jamal-Daoud arrived at O'Hare International Airport in Chicago, Illinois on February 1, 2000, at the age of seventeen, with a Lebanese passport bearing the name Hanni Moussa. He was interviewed by an immigration officer with the assistance of a translator. Jamal-Daoud had no identification with him other than the passport, which he admitted had been falsified. He told the officer his real name, explained that he was born in Iraq, and that he left Iraq in August 1999 and spent six months in Amman, Jordan. While in Jordan, Jamal-Daoud told the immigration officer, he paid $5,000 to obtain the Lebanese passport.

Although he appeared to understand the questions posed by the officer, Jamal-Daoud gave somewhat inconsistent answers. At first, when asked to describe in detail his purpose in coming to the United States, Jamal-Daoud responded: "Financial situation. Hard life in Iraq," and stated that he wished to stay in the United States "all [his] life." He told the officer that he left Iraq "[b]ecause of the embargo situation, no work, no future." Later, when questioned about the basis of his claim for political asylum, Jamal-Daoud stated: "I am afraid that if I go back, they will arrest me." Jamal-Daoud also admitted, however, that he had never been persecuted by the government of Iraq, and that he did not fear persecution by the Iraqi government based on his race, religion, nationality, political opinion, or membership in a particular social group. The immigration officer concluded that §§ 212(a)(4) and (a)(7) of the Immigration and Nationality Act precluded petitioner's admission to the United States and informed him that he must appear before an immigration judge for an exclusion hearing.

On August 22, 2000, Jamal-Daoud filed a written application for asylum with the assistance of counsel. He attached to his application a statement outlining his asylum claim in which he identified himself as an Assyrian Christian and

member of the Chaldean Church. Jamal-Daoud stated that he and his family were persecuted by the Iraqi government. According to petitioner, the problems began when his father began to receive support from relatives in the United States. Authorities in Tell Kaif and Mosul arrested his father repeatedly and eventually arrested his mother as well. Authorities then tried to force Jamal-Daoud to testify against his father. Jamal-Daoud claimed that the authorities told him that his father had connections with Kurds and Assyrians in the North and asked him whether his father gave or received money from these groups. When he responded that he did not know, Jamal-Daoud was "beaten and spat at." Jamal-Daoud claimed that when he was released, relatives helped him leave the country because "they were worried that [he] would be called in and forced to testify to things [he] did not know." He further stated that his parents had escaped to the North and were trying to leave for Turkey "because the situation there is very difficult for Christians." (A.R. 158-59.)

On August 29, 2001, petitioner appeared before an immigration judge ("IJ") for removal proceedings. Jamal-Daoud conceded removability but applied for asylum; the IJ considered the asylum request as a request for withholding of removal and deferral of removal under the CAT as well. *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.3(b). Jamal-Daoud was represented by counsel at the hearing and testified with the assistance of an interpreter. He stated that in February 1999, Iraqi police arrested his father, claiming that he was working against the government and questioned him daily. Jamal-Daoud testified that on June 14, 1999, security agents took him in for questioning about his father's activities. He told the IJ that he had not been beaten, but that he was slapped, spit on, pushed, and insulted. Jamal-Daoud testified that after he was questioned, his uncles helped him leave Iraq for Jordan and that while in Jordan, he obtained a Lebanese passport and airline ticket to Chicago.

Jamal-Daoud admitted that he had provided inconsistent answers during his airport interview but stated: "I was afraid at that time, I was nervous, and I don't know what I was saying then." (A.R. 93.) He told the IJ that he was afraid that if he had answered the questions differently, he would have been returned to Iraq. Jamal-Daoud testified at the hearing that he was still afraid to go back to Iraq because he would be questioned about his parents' whereabouts.

The same day as Jamal-Daoud's appearance, August 29, 2001, the IJ issued an oral decision denying his application for asylum and other relief. The IJ concluded that, although Jamal-Daoud's claim of persecution as an Assyrian Christian was "not inconsistent" with the State Department report, petitioner had failed to present persuasive evidence that he had been persecuted. (A.R. 42.) The IJ highlighted three factors that persuaded him that petitioner's claim was not credible. First, the IJ discussed the certificate of baptism submitted by petitioner in support of his claim to be an Assyrian Christian. The document was printed in English and petitioner testified that his uncles in Iraq had the certificate prepared and sent to him once he was in the United States. The certificate, however, was dated August 24, 1999, the day before Jamal-Daoud claimed he had departed Iraq. The IJ concluded: "given the fact that [petitioner] has no other documentation and entered the United States with the intent to use a visa placed in a Lebanese passport which [petitioner] paid for raises significant questions about his credibility." (A.R. 43.)

Second, the IJ found that petitioner's airport interview "further undercut[ ]" his claim of persecution, noting that Jamal-Daoud provided the wrong date and place of birth. Jamal-Daoud also provided other untruthful answers to the immigration officer, including responses to such crucial questions as why he left Iraq and came to the United States, and whether he had been persecuted by the Iraqi government.

Third, the IJ explained that petitioner's credibility was undermined by the multiple changes of venue in his case. Jamal-Daoud's case was originally brought in Chicago because of his entry to the United States there. On petitioner's request, the case was transferred to Detroit, Michigan because Jamal-Daoud claimed his aunt lived there. Petitioner later requested that the case be sent back to Chicago because "he had neither family nor friends in the Detroit area." Petitioner next requested that his hearing be continued because he needed witnesses who lived in the Detroit area to corroborate his claims. The IJ denied that request. Petitioner then asked that his hearing be expedited but submitted no additional evidence to support his claim for asylum.

On February 4, 2003, the BIA affirmed the IJ's order without issuing a separate opinion. Jamal-Daoud petitions this Court for review.

## II.  Discussion

Petitioner presents three claims that he asks this Court to review: (i) his request for asylum; (ii) withholding of removal; and (iii) protection under the CAT.

### A.  Asylum

We begin with petitioner's request for asylum based on religious persecution. To establish eligibility for asylum, an applicant must demonstrate that he is a "refugee" under the Immigration and Nationality Act ("INA"). *Liu v. Ashcroft*, 380 F.3d 307, 312 (7th Cir. 2004). The statute defines "refugee" as one who is unable or unwilling to return to his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8

U.S.C. § 1101(a)(42)(A). It is petitioner's burden to prove that he is a refugee and eligible for asylum. 8 C.F.R. § 208.13(a).

Persecution is defined as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Liu*, 380 F.3d at 312. If an applicant is found to have suffered past persecution, he is entitled to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); *Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2003). In the absence of such a finding, the applicant must prove that he genuinely fears he will be persecuted based on a protected ground if returned to his native country, and that his fears are objectively reasonable. *Liu*, 380 F.3d at 312. The "subjective fear component turns largely upon the applicant's own testimony and credibility." *Balogun v. Ashcroft*, 374 F.3d 492, 499 (7th Cir. 2004). The objective component requirement can be met "either through the production of specific documentary evidence or by credible and persuasive testimony." *Id.*

Because the BIA affirmed the IJ's decision without issuing a separate opinion, the IJ's decision becomes that of the BIA for the purposes of judicial review. *Georgis v. Ashcroft*, 328 F.3d 962, 966-67 (7th Cir. 2003). We review this decision under the highly deferential substantial evidence test. *Id.* at 967. Under this standard, we must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole, and we are not at liberty to overturn the Board's determination simply because we would have decided the case differently. *Id.* Only where the evidence in support of the application is so compelling that no reasonable factfinder could fail to find the requisite fear of persecution will we reverse the Board's decision for lack of evidence. *Id.* at 967-68 (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).

The IJ's credibility determinations, as adopted by the BIA, are questions of fact and should only be overturned under extraordinary circumstances, although they must be supported by specific, cogent reasons that bear a legitimate nexus to the finding. *Balogun*, 374 F.3d at 498. We have previously explained that credibility is the "linchpin of a well-founded fear claim." *Id.* at 499. If credible, the testimony of the applicant may be sufficient to sustain the burden of proof without corroboration. If the IJ finds the testimony not to be credible, however, then the applicant must come forward with a convincing explanation of the discrepancies or extrinsic and credible corroborating evidence. *Id.* at 499-500.

Jamal-Daoud's primary argument is that the IJ erred in relying on his airport interview to make an adverse credibility determination. Petitioner emphasizes that he was extremely nervous during the interview and that the questioning was "mainly one-sided and did not really engage [p]etitioner in a conversation where he felt free to talk with the INS officers about his experiences in Iraq and his fears about future persecution." This Court has recognized that airport interviews are useful only if they are reliable. Relying on the Second Circuit's opinion in *Ramsameachire v. Ashcroft*, 357 F.3d 169 (2d Cir. 2004), we recently set forth a non-exclusive list of factors to consider in determining whether an asylum seeker's airport interview is reliable:

> First, a record of the interview that merely summarizes or paraphrases the alien's statements is inherently less reliable than a verbatim account or transcript. Second, similarly less reliable are interviews in which the questions asked are not designed to elicit the details of an asylum claim, or the INS officer fails to ask follow-up questions that would aid the alien in developing his or her account. Third, an interview may be deemed less reliable if the alien appears to have been reluctant to reveal

> information to INS officials because of prior interrogation sessions or other coercive experiences in his or her home country. Finally, if the alien's answers to the questions posed suggest that the alien did not understand English or the translations provided by the interpreter, the alien's statements should be considered less reliable.

*Balogun*, 374 F.3d at 505 (quoting *Ramsameachire*, 357 F.3d at 180).

Considering these factors, we are confident that the airport interview was reliable and part of a sound basis for finding petitioner's asylum claim incredible. The first and fourth *Balogun* factors squarely cut against petitioner's assertion that the interview was unreliable. The record contains a full transcript of the interview, which was conducted with the benefit of a translator. Based on this transcript, there is no indication (nor does petitioner argue) that he did not understand the questions. *Cf. Balasubramanrim v. INS*, 143 F.3d 157, 163-64 (3d Cir. 1998) (finding that BIA's adverse credibility determination based entirely on discrepancies between petitioner's airport statement and testimony to the IJ was unreasonable where petitioner knew little English, was not provided a translator during the airport interview, and questions posed were not designed to elicit the details of an asylum claim). Moreover, we note that petitioner did not previously challenge the use of this transcript. *See Balogun*, 374 F.3d at 505 ("Any concern that we might have about the transcript reflecting the substance of the interview is relieved by the fact that Ms. Balogun did not object to this document's admission into evidence.").

Jamal-Daoud focuses primarily on the second *Balogun* factor, arguing that the INS officer did not ask appropriate follow-up questions to elicit an account of persecution. The transcript reflects the following exchange:

Q: What is the basis of your claim for political asylum?

A: I am afraid that if I go back, they will arrest me.

Q: Why did you leave to begin with?

A: Because of the embargo situation, no work, no future.

Q: Has the government of Iraq ever done anything to you that makes you unwilling to return to Iraq?

A: No.

Q: Were you ever persecuted by the government of Iraq?

A: No.

Q: Do you fear persecution by the government of Iraq on account of your race, religion, nationality, political opinion or membership in any particular social group?

A: No.

Q: Please describe in detail the basis of your fears of persecution in your country.

A: If I go back to Iraq, they will arrest me.

Q: You appear to be inadmissible to the United States pursuant to Section 212(a)(4) and 212(a)(7)(A)(i)(I) of the I&NA. Do you understand that you do not appear to be eligible to enter the United States at this time?

A: Yes.

Q: You must appear before an immigration judge for an exclusion hearing. At this

> hearing, the judge will decide whether or
> not you are admissible to the United States.
> Do you understand?
>
> A:  Yes.
>
> Q:  Do you have nothing you would like to add
> to this statement?
>
> A:  No.
>
> Q:  Did you understand my questions and every-
> thing the  interpreter asked you?
>
> A:  Yes.

(A.R. 120.)

Petitioner contends that once he indicated he feared being arrested if he returned to Iraq, the INS officer should have asked more extensive follow-up questions to elicit the basis for this fear. Although the officer could have probed further into the specifics of petitioner's claim, he did ask several follow-up questions aimed at drawing out the nature of petitioner's asylum claim. Particularly in light of Jamal-Daoud's earlier answers regarding his financial reasons for leaving Iraq, the INS officer was not obligated to do more.

Petitioner also asserts that the interview was unreliable because he simply shut down and answered "no" systemati-cally to all asylum-related questions. The transcript belies petitioner's contention. Petitioner responded to three ques-tions with a simple "no" only after providing more respon-sive answers to 35 earlier questions.  Just moments before he answered "no" to the officer's questions about whether he had been persecuted, Jamal-Daoud was remarkably candid, admitting that he paid $5,000 for a falsified passport and that he came to Chicago because "[i]n Chicago, you don't ask to[o] many questions. I have a better chance in Chicago than any where else." (A.R. 119.) Petitioner's frank re-sponses to these questions indicate that, although he may

have been nervous, he was not intimidated or coerced into the answers he provided. We conclude that the IJ was not unreasonable in relying on the airport interview as one of several considerations in concluding that petitioner's claim was not credible. *See Balogun*, 374 F.3d at 504 (accepting IJ's determination that petitioner was not credible where her misrepresentations to officials were "numerous and apparent" and IJ "justifiably set these misrepresentations against the backdrop of the whole record").

In addition to the airport interview, a review of petitioner's asylum application and his testimony at the removal proceeding reveals several key discrepancies, including as to whether petitioner was arrested and beaten or just questioned and harassed. Moreover, the statement attached to petitioner's asylum application and his testimony presented entirely different facts from those provided during his airport interview. We note that the only corroboration petitioner provided was his baptism certificate, which, given the language and date discrepancies, raised more questions than it answered. Because the IJ found his testimony incredible, petitioner is obligated to come forward with more. In sum, petitioner has presented no extraordinary circumstances that would justify superseding the IJ's adverse credibility finding, and we conclude that the IJ was reasonable in denying petitioner's application for asylum.

## B. Withholding of Removal; Protection Under CAT

The government contends that we lack jurisdiction to consider petitioner's claims for withholding of removal and protection under the CAT because petitioner did not specifically challenge the IJ's denial of these forms of relief in his appeal brief to the BIA. We disagree. Jamal-Daoud appealed the IJ's decision generally based on the IJ's alleged failures to understand the true nature of his case, to accord proper weight to his testimony, and to consider the

State Department report regarding country conditions, as well as the IJ's over-emphasis on the airport interview. These alleged errors applied equally to all of petitioner's claims, and petitioner's appeal was sufficient to preserve the issue for our consideration.

Petitioner's claims for withholding of removal and CAT protection fail on the merits, however. To be eligible for withholding of removal, petitioner must establish a clear probability of persecution if returned to Iraq; in other words, he must prove that it is more likely than not that he would be subject to persecution. *Prela v. Ashcroft*, 394 F.3d 515, 519 (7th Cir. 2005). Because the standard of proof for withholding of removal is higher than that needed to establish eligibility for asylum, the failure to sustain the burden of proof for asylum necessarily precludes eligibility for withholding of removal. *Oforji v. Ashcroft*, 354 F.3d 609, 614 n.1 (7th Cir. 2003).

Petitioner's inability to prove his asylum claim does not necessarily preclude CAT protection. To establish that he is entitled to such protection, Jamal-Daoud must show that it is more likely than not that he would be tortured if returned to Iraq. *See* 8 C.F.R. §§ 1208.16(c)(2) and 1208.18(a). In this case, however, petitioner's request for CAT protection is based on exactly the same evidence that the IJ found not to be credible. Because we affirm the IJ's credibility determinations, we must also affirm the rejection of petitioner's claim for protection under the CAT.

Finally, we note that petitioner asks us to take judicial notice of the ever-growing violence against Iraqi Christians in considering each of his claims. He points out that as of August 2004, five Christian churches (four of which were Assyrian) have been bombed in Iraq. As a general matter, we may take judicial notice of changed conditions in the alien's country of origin. *Medhin v. Ashcroft*, 350 F.3d 685, 690 (7th Cir. 2003); *Nwaokolo v. INS*, 314 F.3d 303, 308 (7th Cir. 2002). While it is obvious that conditions in Iraq

have changed dramatically since petitioner filed his petition for asylum in August 2000,[1] he has failed to demonstrate how these changes affect his individual situation. Even with this updated information, Jamal-Daoud has not shown that he is eligible for the relief he seeks.

### III.  Conclusion

For the foregoing reasons, the order of the BIA is AF-FIRMED.

A true Copy:

     Teste:

 

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*

---

[1] The government informed us at oral argument that it is not presently removing deportees to Iraq. The question before us, however, is the validity of the Board's removal order.