*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0222p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NAJAH GORGES ELIAS,

*Petitioner,*

*v.*

No. 06-3366

ALBERTO R. GONZALES, United States Attorney
General,

*Respondent.*

>

On Petition for Review from the
Board of Immigration Appeals.
No. A95 575 407.

Submitted: April 18, 2007

Decided and Filed: June 15, 2007

Before: MERRITT and GRIFFIN, Circuit Judges; LAWSON, District Judge.[*]

---

## COUNSEL

**ON BRIEF:** Roger R. Rathi, LEGALQUEST NETWORK, Southfield, Michigan, for Petitioner.
Jamie M. Dowd, Michelle Gorden Latour, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Respondent.

The court delivered a PER CURIAM opinion. MERRITT, J. (pp. 9-10), delivered a
concurring opinion.

---

## OPINION

---

PER CURIAM. In this asylum case, petitioner Najah Gorges Elias, a native of Iraq and
Chaldean Christian, seeks reversal of a Board of Immigration Appeals ("BIA") decision dismissing
his appeal from an oral decision of an Immigration Judge ("IJ"). For the following reasons, we grant
the petition for review, vacate the decision of the BIA, and remand for a new hearing before another
IJ.

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting
by designation.

I.

At the time of his removal hearing on October 20, 2004, petitioner was a thirty-one year old male citizen of Iraq who entered the United States on or about May 1, 2003, in or near Detroit, Michigan. He is an ethnic Chaldean who practices the Catholic religion. In addition to being identified as a "minority religion" in Iraq, there is evidence that Assyrian and Chaldean Christians are considered by other Iraqis to constitute a distinct non-Arab ethnic minority.

Petitioner entered the country on a visa that identified him as the fiancé of a United States citizen and allowed him to stay in the country until July 30, 2003. Petitioner and his fiancée decided not to get married, and petitioner stayed in the country beyond July 30, 2003. Petitioner conceded removeability, but sought relief from removal through an application for asylum, which is also considered an application for non-discretionary withholding of removal. Petitioner also applied for relief from withholding of removal pursuant to Article 3 of the United Nations Convention Against Torture ("CAT").

At the removal hearing, the parties and the interpreter were all present in a courtroom in Detroit, Michigan; but the IJ sat in New York City, hearing the case through televideo connection. Petitioner claims that he began to be harassed at the age of 15 when he was forced to attend mandatory religion classes in Islam at his high school. He also testified that on December 12, 1990, he was arrested one day at school for distributing anti-religion and anti-government fliers, which he says he did not do. After this arrest, he was detained for about 33 days at various locations, beaten, and given little food. He was released and returned home, but did not seek any medical treatment. He returned to school on January 17, 1991,[1] but he claims he was not allowed to return. His asylum application states that he completed high school in June 1991.

Petitioner testified that he was conscripted into the Iraqi Army in February 1991, and that he was detained for three months, from August 1992 until November 1992, when he was found reading the Bible in his barracks.

Petitioner testified that he left Iraq in November 1998 due to fear that he would be harmed by Baath Party members based on two incidents in November 1998. In the first incident, petitioner intervened when some Baath Party members began to harass female members of petitioner's church as they left church on Sunday, November 1, 1998. He drove the harassers off, but petitioner claims that they swore to get revenge on him. Petitioner became involved in another encounter with Baath Party officials on November 12, 1998, after they harassed his sister and her friend outside the store where he worked. An altercation ensued and a Baath Party member pulled a gun, but petitioner was not injured. Petitioner's brother was arrested and detained.

After the second incident, petitioner's family decided that petitioner needed to leave Iraq. A false passport was obtained, and petitioner testified that he left Iraq for Jordan on November 29, 1998. He remained in Jordan until March 2002. He then traveled to Malta where his family had arranged for him to marry a native-born United States citizen whose family was from Malta. Although he had spoken on the phone to the woman, this was the first time they met. He then traveled to the United States on a visa secured by his fiancée, and they planned to marry within a few months of his arrival. Once in the United States, petitioner said he and the woman decided not to marry because she was too "westernized."

---

[1]The judge's oral decision says "January 17, 2001," but the judge must have misspoken given that the month after December 1990 is January 1991.

Petitioner's application for the visa to come to the United States to marry a U.S. citizen stated that he had lived in Amman, Jordan since April 1997, not November 1998. Petitioner signed the application and attested to its truthfulness, but stated at the hearing that he had no idea what the visa application said and that his lawyer had filled it out.

The IJ issued an oral decision at the conclusion of the hearing and found petitioner lacked credibility on issues material to his claim. The judge cited the discrepancy between petitioner's visa application that said he had been in Amman, Jordan from April 1997 to 2002, and petitioner's hearing testimony that he was in Iraq until November 1998 when he then fled to Jordan after the altercation with the Baath party members. We acknowledge the confusion around this issue – with the visa application saying he left Iraq in April 1997, his passport bearing an issuance date of September 1998, and petitioner testifying that he did not request or receive the passport until November 1998.[2] Based on these discrepancies, the IJ concluded that petitioner was not in Iraq in November 1998 and that he had fabricated the story about the altercation with Baath Party members in November 1998.

The judge also pointed to the discrepancy between the asylum application and petitioner's testimony concerning when he left high school and joined the Army. Petitioner testified that he was expelled from high school and conscripted into the Army in February 1991, but his application states that he left high school in June 1991. The judge did not believe that petitioner joined the Army in February 1991, because petitioner did not know exactly when the first Gulf War ended and that local uprisings had occurred in Iraq in March and April of 1991. The judge found that if petitioner had been a soldier in the Iraqi Army during this time he would know this information.

The judge also did not believe petitioner's testimony regarding the genuineness of his engagement to a U.S. citizen whom he had only just met. He found it difficult to believe that petitioner's family had arranged his marriage to an American woman whose family came from Malta, stating that it looked like the proposed marriage was arranged simply so that petitioner could come to the United States. Despite persistent questioning by the IJ, petitioner insisted that the engagement was not a sham, that arranged marriages were not uncommon in his culture, and that he did intend to marry his fiancée when he came to the United States, but that when they got to know each other better, they decided that marriage was not a good decision for them.

The IJ also found the petitioner's asylum application frivolous, thereby barring a grant of asylum to petitioner forever. The judge also found petitioner was a "persecutor" of others based on some of his duties during his service in the Iraqi Army, which provides another basis to ban petitioner forever from asylum in this country.

As to petitioner's fear of future persecution should he be returned to Iraq, the IJ noted that during the time of the Hussein regime, Christians were generally not bothered and were allowed to practice their religion freely. In discussing the evidence submitted by petitioner concerning the documented increase in violence against Christians and "violent attacks" on churches since the fall of the Hussein regime, the judge dismissed it because "there is no systematic and organized persecution or systematic and organized practice of persecution in the Christian community there." The judge also dismissed petitioner's claim under the CAT in one paragraph, stating there was no evidence that any mistreatment rose to the level of torture and that any threat of torture came from individuals, not the government.

---

[2] Petitioner testified that the person from whom the false passport was purchased backdated the passport to September to make it look like petitioner was not leaving based on the altercations with the Baath Party members in November.

In its short opinion affirming the IJ, the BIA identified two bases for its decision to affirm the IJ. First, it found support in the record to defer to the IJ's adverse credibility determination. Based on these alleged misrepresentations, the Board also upheld the IJ's finding that petitioner filed a frivolous application. The BIA's second rationale for affirming the IJ is that petitioner did not challenge on appeal the IJ's finding that, while in the Iraqi Army, petitioner was involved in the persecution of others based on their political opinions, and he is therefore barred from a grant of asylum under § 208(b)(2) of the Immigration and Nationality Act.

The Board, however, did not adopt and affirm the IJ's "intemperate" description of an altercation between the petitioner and men who allegedly had harassed his sister and her friend. Although the Board acknowledged the IJ's improper comments, it did not find that the IJ's conduct deprived petitioner of a full and fair hearing. Board of Immigration Appeals decision, Case No. A95-575-407, Feb. 16, 2006, at 2.

The Board said nothing about the claim for asylum based on the current status of Chaldean Christians in Iraq or about the changed circumstances in Iraq since petitioner filed his application. It also did not mention petitioner's claim under the CAT.

II.

To be eligible for asylum, an alien must prove that he is a "refugee," i.e., a person who is "unable or unwilling to return to" his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An alien must establish that he was persecuted in the past or that he has a well-founded fear of being persecuted in the future before being deemed a refugee. *Pilica v. Ashcroft,* 388 F.3d 941, 950 (6th Cir. 2004); 8 C.F.R. § 208.13(b). An applicant who establishes past persecution shall be presumed to have a well-founded fear of future persecution on the basis of the original claim. 8 C.F.R. § 208.13(b)(1). This presumption of future persecution can be rebutted if the IJ finds by a preponderance of the evidence that there has been "a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality." 8 C.F.R. § 208.13(b)(1)(i)(A). Additionally, an asylum applicant can also prove a well-founded fear of future persecution by showing that he genuinely (subjectively) fears he will be persecuted based on a protected ground if returned to his native country, and that his fears are objectively reasonable. *Jamal-Daoud v. Gonzales,* 403 F.3d 918, 922 (7th Cir. 2005).

Where, as here, the BIA expressly adopts and affirms the IJ's decision but adds comments of its own, we directly review the decision of the IJ while also considering the additional comments made by the Board. *See Gilaj v. Gonzales,* 408 F.3d 275, 283 (6th Cir. 2005).

III.

We have concerns about the adverse credibility determination made by the IJ and affirmed by the Board. For example, the IJ questioned why petitioner's passport was dated September 1998 when he did not leave the country until November 1998. Petitioner tried to explain that it would look suspicious if he had a passport dated at the time the authorities were looking for him, so it was backdated. The judge said petitioner's explanation did not make any sense, but, in any event, we do not see how the apparent discrepancy is particularly relevant. The judge seemed to view this discrepancy of two months on the passport issue date as demonstrating a lack of credibility about the November 1998 altercation, but the passport was false anyway, and petitioner's family purchased it so that he could get out of the country. The issuance date on a false passport is not particularly relevant to petitioner's claim of persecution and does not demonstrate that he was not in the country in November 1998.

The judge also found that petitioner's lack of knowledge about the end date of the first Gulf War and about the uprisings in the north and south of Iraq against the Hussein regime immediately after the war demonstrated a lack of credibility as to when he entered the military. The IJ questioned petitioner at length about the start and end dates of "the war," and when petitioner's recollection of those dates did not coincide with the judge's, the judge interpreted this to mean that petitioner had not been in the Army in early 1991.[3]   Whether petitioner is familiar with the specifics of the war is of little matter here. His complaint is that he was persecuted while in the Army based on his religion, specifically noting a detention from August 1992 to November 1992, and whether he entered the Army in February 1991 or June 1991 does not seem material. The judge does not question that petitioner actually served in the Army and was there in 1992, which seems to be the relevant issue.

The judge also found it incredible that petitioner did not seek medical treatment after being detained for 33 days in late 1990. He stated that petitioner should have at least gone to a doctor here in the United States to look for remnants of the beatings petitioner claims took place during this detention, such as "bruises or scars." It is highly unlikely that there would be any physical evidence of beatings that occurred 11 years *prior* to petitioner's arrival in the United States – certainly any bruises would have long-since healed. Furthermore, petitioner never claimed that the beatings left any permanent injury or broke any bones – he testified only that he had been hung from a fan, beaten repeatedly, and deprived of food for 33 days.

The judge also expressed incredulity about petitioner's arranged marriage to the United States woman whose family came from Malta, stating that it looked like the marriage was arranged simply so that petitioner could come to the United States. Petitioner insisted that the engagement was not a sham and that he did intend to marry his fiancée when he came to the United States. The judge appeared to base his finding that the engagement testimony lacked credibility first on the fact that petitioner would marry someone he had only just met. Arranged marriages are still common throughout the world, even if not in the United States. *See, e.g., United States v. Anwar*, 428 F.3d 1102, 1107 (8th Cir. 2005) ("Saqib Chudarry (Chudarry), a native of Pakistan, testified Anwar stated he had arranged marriages . . . ."), *cert. denied*, – U.S. –, 126 S. Ct. 1806 (2006); *Lata v. INS*, 204 F.3d 1241, 1243 (9th Cir. 2000) ("Lata testified that, as Hindus, ethnically Indian Fijian girls have arranged marriages . . . ."); *United States v. Sriyuth*, 98 F.3d 739, 742 (3d Cir. 1996) (referring to "the Laotian custom of arranged marriages"). Second, the judge found the testimony lacked credibility because petitioner said he and his fiancée planned a large wedding to take place shortly after petitioner arrived in the United States. The judge said that it was impossible to put together a "large" wedding in just a month or two and found this to demonstrate lack of credibility. We do not know how an immigration judge in New York has any idea how long it takes to plan a wedding of any size in Michigan – things may be different in Dearborn, Michigan, than they are in New York City. It may be entirely possible to plan a "large" wedding in a couple of months in the Dearborn community.

The IJ was clearly frustrated with what he saw as lack of responsiveness and evasiveness by petitioner during the teleconference hearing. The transcript demonstrates that petitioner was having a hard time understanding the judge. The cause for petitioner's failure to understand may have been language problems, distance, or nervousness. As will be discussed below, the judge often berated petitioner during the hearing, and this approach exacerbated petitioner's nervousness. What the IJ, hundreds of miles away in New York, took to be evasiveness and lack of responsiveness may have been fear or intimidation.

---

[3]In fact, Iraq invaded Kuwait on August 2, 1990. The United States offensive began on January 16, 1991, with missile fire. The ground offensive by U.S. and coalition troops ran between February 24 and 28, 1991. A review of the transcript seems to demonstrate that when the judge kept referring to the "war," the judge meant the U.S. invasion of Iraq in early 1991, and petitioner was referring to the Iraqi invasion of Kuwait, which was about five months earlier.

IV.

While we have stated our concerns about the IJ's credibility determination, we are especially troubled by the conduct of the IJ during the hearing and its effect on the petitioner's ability to testify accurately. We cannot conclude that the IJ's adverse credibility determination is supported by substantial evidence due to the IJ's behavior during the hearing. The record contains many instances of questioning and commentary by the IJ that lead us to believe that petitioner did not receive a fair hearing. This is the rare case where remand is required because of the IJ's apparent bias and hostility toward Elias.

An immigration judge has a responsibility to function as a neutral, impartial arbiter and must refrain from taking on the role of advocate for either party. During the course of the hearing, the IJ repeatedly addressed petitioner in an argumentative, sarcastic, and sometimes arguably insulting manner that went beyond fact-finding. "Even when, as here, an [IJ] firmly believes a petitioner is not truthful, repetitive verbally abusive comments and questions taint the proceeding and erode the appearance of fairness and call into question the results of the proceeding." *Islam v. Gonzales*, 469 F.3d 53, 55-56 (2d Cir. 2006). The judge's questioning and comments created an atmosphere in which it may have been difficult for Elias to advocate fully on his own behalf. In fact, the interpreter told the judge at one point when the judge was berating petitioner that he believed that petitioner was "afraid" of the judge. Because the IJ's conduct at the hearing creates substantial uncertainty as to whether the record below was fairly and reliably developed, we find it necessary to remand for a new hearing. Several examples of this improper conduct follow.

When referring to dates, petitioner used the form common throughout much of the world: day-month-year. For example, February 15, 1991, would be stated as "15-2-91." The IJ seemed at first confused and then angered by this form of speech and accused the petitioner of trying to confuse him when there was nothing in the record to support that accusation. The petitioner tried to give dates in the form the judge wished, but he sometimes forgot or would get himself confused in trying to make the date clear. The judge showed little patience for this and in his opinion stated "[t]hat tended to be how he usually gave dates, not stating a month but *merely rattling off numbers in that fashion*." (Emphasis added.) At the least, this demonstrates ignorance of the manner in which much of the world communicates dates.

In his oral decision, the judge derided petitioner's explanation of how he verbally sparred with Baath Party members and raised a stick to them when they were armed with guns. The judge likened petitioner's conduct to the movie characters Indiana Jones or Jackie Chan, stating that the description seems "more like something out of an action adventure movie than anything akin to reality" and stated that he believed none of it.

The judge at one point asked the interpreter if petitioner understood the interpreter, and the interpreter indicated that he thought so and said that he thought that petitioner was "just not comfortable." The judge sarcastically replied, "He's not comfortable. Well, can we get him a pillow or something?" The petitioner admitted later in the hearing in response to a question by the judge that he was not understanding the questions very well and that he was "afraid" of talking to the judge.

It was clear throughout the hearing that petitioner and the IJ did not always understand each other, especially when they were discussing numbers and time frames. For example, after going back and forth for a couple of minutes concerning petitioner's detention in late 1990, the IJ asked petitioner to tell him how long he was detained. Petitioner tried to explain that he was first held for three days at a Baath Party office and then he was transferred to Mosul, where he remained for about one month. The judge interrupted him and said,

Q:      Sir, listen. Don't talk, listen. Nobody asked you to speak. You were asked
        how long you were detained, period, in total. You said three days. Sir –
A:      I'm sorry, I didn't understand.

Q:      I didn't ask you to speak. I asked you to listen. Every time you speak we'll
        start over again. So, for the third time, you were asked how long you were
        detained in total. You answered three days. You answered three days.
A:      Your honor?

Q:      Huh?
A:      You want me to answer Your Honor?

Q:      [to interpreter] He is not to speak. Did he answer?

                                    . . .

Q:      . . . Okay, we're going off the record. Maybe [petitioner's attorney] should
        explain to you what it means not to speak, OK?

When they went back on the record, the judge accused petitioner of either making up his own questions and then answering them or having a prepared response and told petitioner that he "would lose his case for sure" if he continued to answer the questions in a manner the judge did not like. Despite the judge's confusion about the time frame of petitioner's detention in 1990, a review of the transcript shows that petitioner was always clear that the detention was for 33 days and that he only mentioned the three days in response to a question about where he was held – which was two different places for two different amounts of time totaling 33 days. The judge frequently cut off petitioner's attempts to explain, thereby prohibiting petitioner from fully answering the question and resulting in confusion on both sides.

This is not the first case in which the conduct of this IJ has raised substantial questions as to his bias and hostility toward a petitioner. We agree with the BIA that his manner was "intemperate," and he was inappropriately sarcastic with petitioner and appeared at times to badger petitioner – likely making petitioner more nervous and affecting his testimony.

Since the admonishment by the BIA in this case, the IJ has been removed from the bench. His inappropriate conduct had been noted in at least ten opinions or orders issued by the Second Circuit since 2005. *Chen v. Gonzales*, No. 06-1940-ag (summary order) (2d Cir. Jan. 30, 2007); *Islam v. Gonzales*, 469 F.3d 53 (2d Cir. 2006); *Yu Hua Xiao v. Gonzales*, No. 04-5736-ag (summary order) (2d Cir. Oct. 26, 2006); *Ti Wu Gao v. Gonzales*, No. 05-0012-ag (summary order) (2d Cir. Sept. 29, 2006); *Qiu Hui Liu v. United States Dep't of Justice*, No. 05-3181-ag (summary order) (2d Cir. Aug. 1, 2006); *Huang v. Gonzales*, 453 F.3d 142 (2d Cir. 2006); *Jin Yong Chen v. Gonzales*, No. 04-5826 (summary order) (2d Cir. Apr. 28, 2006); *Liu v. Board of Immigration Appeals*, No. 05-0903-ag (summary order) (2d Cir. Feb. 17, 2006); *Hajderasi v. Gonzales*, No. 04-2784-ag (summary order) (2d Cir. Feb 13, 2006); *You-Mei Ding v. CIS*, No. 034915 (summary order) (2d Cir. Aug. 8, 2005). Before his removal, the Second Circuit, in a highly unusual move, requested that a Justice Department appeals board review all immigration cases on appeal involving this IJ.[4] *Ba v. Gonzales*, No. 05-5043-ag (summary order) (2d Cir. Feb. 21, 2007).

Based on the removal of the IJ from the bench and the request of the Second Circuit to review all his pending cases, as well as our own review of the record in this case, we must vacate

---

[4]IJs are appointed by, and employees of, the United States Department of Justice.

and remand.  Petitioner was entitled to a fair hearing, but did not receive one.  Where such displays of hostility or bias have occurred, we have remanded for reconsideration before a different immigration judge.  *See Mece v. Gonzales*, 415 F.3d 562, 578 (6th Cir. 2005).

V.

The BIA's decision is vacated and the case is remanded to the Board with instructions that it be assigned to a different IJ for further proceedings consistent with this opinion.

------------------------------

## CONCURRENCE

------------------------------

MERRITT, Circuit Judge, concurring. I concur separately to note that even if the presumption based on past persecution has been rebutted, petitioner still has a well-founded fear of persecution based on current conditions in Iraq. He has submitted several newspaper articles from the time period of the hearing (October 2004) demonstrating worsening conditions for Christians in Iraq since the regime change in 2003. While acknowledging the newspaper articles, the judge noted that the claims of danger presented by petitioner were consistent with general civil strife rather than the targeted persecution needed to establish refugee status. The Board of Immigration Appeals did not address the fear-of-future-harm argument raised by petitioner, or the regime change in Iraq, so the immigration judge's oral decision is the only ruling on this matter.

Regarding petitioner's fear of future persecution, the immigration judge's finding of changed country conditions due to the fall of Saddam Hussein's regime does not dispose of Elias' religious and ethnic persecution arguments. The fact that the Baath Party has been removed from power does not mean that conditions in Iraq have improved for Christians. *See Dawood v. Gonzales*, No. 05-4496 (6th Cir. Feb. 26, 2007) (Chaldean Christian); *Margos v. Gonzales,* 443 F.3d 593, 598 (7th Cir.2006) (Assyrian Christian) ("Ironically, under [ ] Hussein's iron fist, Assyrian Christians and similar minorities were arguably better off as their dictator did not tolerate factional strife and civil unrest within 'his' country (unless it furthered his own ends)."). Independent analysis of a claim of fear of future persecution is required. *See Youkhana v. Gonzales*, 460 F.3d 927, 932 (7th Cir. 2006) (immigration judge erred in not looking to how changed country conditions affected petitioner's fear-of-future-persecution claim).

Even back in 1998, at or near the time petitioner still lived in Iraq, the State Department's 1998 Country Report on Iraq suggested that the Iraqi government had engaged in abuses against the Assyrian Christians. I also take judicial notice of the State Department's 2005 Country Report on Iraq that states that while governing law now provides for freedom of religious belief and practice, "[d]eficiencies in security force capabilities and in the rule of law made it difficult for the justice system to investigate or address violations of these rights," noting particularly the "harassment of Christians." More generally, it paints a picture of "[a] climate of extreme violence" in which "[r]eports increased of killings by the government or its agents" as well as by "common criminals, insurgents, and terrorists . . . sometimes masking their identity in police and army uniforms." On remand, therefore, I believe the immigration judge must consider whether the Iraqi government[1] has failed to protect Chaldean Christians like Elias from persecution by insurgents or Muslim extremist organizations, and, if so, whether this constitutes a ground for granting asylum (or some other form of relief from removal) to Elias. *See Galina v. INS,* 213 F.3d 955, 958 (7th Cir. 2000) (persecution can be found even though "government authorities . . . did not actually perpetrate or incite [ ] persecution, [if they] condoned it or at least demonstrated a complete helplessness to protect the victims").

Moreover, since the petitioner's hearing in October 2004, conditions for Christians in Iraq have worsened further. Although always a very small minority in Iraq, about 1.5 million Christians lived there in the early 1980s, as they had for hundreds of years, coexisting with their Muslim

------------------------------

[1] Since the conclusion of the initial phase of the U.S. action in Iraq, various governing authorities have existed. As of May 16, 2003, Iraq was governed by the Coalition Provisional Authority. On June 28, 2004, the Coalition Provisional Authority transferred power to the Iraqi Interim Government, which in turn handed the reins over to the Iraqi Transitional Government on January 30, 2005; since that time, in early 2006, the elected government of Iraq has taken over.

neighbors.  Even under much of the Hussein regime, which was basically secular, Christians were not generally targeted for persecution or harassment.  That began to change in the 1990s as Iraq came under the influence of Islamic clerics.  The number of Christians in Iraq is put at less than 500,000 today.  Many have left the country or are trying to leave.

A panel of our court addressed the plight of Chaldean Christians recently in *Dawood v. Gonzales*, No. 05-4496 (6th Cir. Feb. 26, 2007).  In that case, the immigration judge found that since Hussein has been overthrown, there "is no information or documentation that would lead it [the court] to believe that Christian or ethnic Chaldeans are singled out for persecution by any group in Iraq."  *Id.* at *1.  The immigration judge in the instant case made a similar finding:  "[T]here is no systematic and organized persecution or systematic and organized practice of persecution in the Christian community there [in Iraq].  I do not find that the [petitioner] has established at the present time even that there's a pattern or practice against Christians."  Oral decision of the Immigration Judge at 22.

On remand, Elias' claim of fear of future persecution should be reexamined in light of conditions described in the Department of State country report on Iraq.  The report states in part:

> There were numerous incidents of violence against the Christian community this year, ranging from individual killings to intimidation . . . .  The number of Christians leaving the country rose after bombings of 14 churches in Baghdad and Mosul from August through December [2004].  The bombings left 43 dead and 340 injured, as well as damaging the churches.

(http://www.state.gov.g.drl/rsl/hrrpt/2004/41722.htm.)  Recent press reports demonstrate that these attacks against Christians continue.  *See, e.g.,* Associated Press, *In Jordan, Christians From Iraq Harassed*, N.Y. Times, Mar. 15, 2007 (describing that Iraqi Christians who endured persecution in Iraq before fleeing to Jordan continue to face persecution in Jordan because they are Christian); Patrick Cockburn, "*Exodus" of Iraq's Ancient Minorities*, Independent (United Kingdom), Feb. 26, 2007 (one reason Christians targeted in Iraq because U.S. and Britain, the countries blamed for the war, are predominantly Christian nations);  Niraj Warikoo, *Detroit Anticipates More Iraqi Refugees*, Detroit Free Press, Feb. 14, 2007 (noting that at least 200,000 Iraqi Christians have fled Iraq since 2003); Statement of Nina Shea, Director, Center for Religious Freedom, Before the Committee on International Relations Subcommittee on Africa, Global Human Rights, And International Operation (Dec. 21, 2006) (concerning persecution of Christians in Iraq); Statement of the Chaldean Federation of America On the Iraqi Christians Plight To the U.S. Senate Committee on the Judiciary (Jan. 16, 2007) (full statements may be found at http://www.chaldeanfederation.org/news/senate.html ); *see also* Press reports cited in *Dawood v. Gonzales*, at *3.  Both the press reports and government reports show that followers of the Christian faith make up a small and shrinking minority in Iraq and that the number of Christians has decreased dramatically in recent years.  Based on this evidence, I would remand petitioner's asylum claim on the additional ground of fear of future persecution based on his Christian religion should he be returned to Iraq.

So long as our asylum standards remain the same as they are today for aliens, the Department of Justice enforcement agencies must improve the quality of their review process.  We see too many mistakes of inappropriate manipulation of credibility findings by reviewing officials, as we find in this case in which the official was discharged.  Nina Bernstein, *U.S. Relieves Judge of Duties in Courtroom*, The New York Times, Mar. 13, 2007.  *See also* Nina Bernstein, *In New York Immigration Court, Asylum Roulette*, New York Times, Oct. 8, 2006 (noting stark disparities in whether asylum granted or denied depending on the immigration judge assigned to the case and particularly noting the rebukes received by then-Immigration Judge Chase from the Second Circuit).