NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 8, 2007
Decided October 31, 2007

**Before**

Hon. FRANK H. EASTERBROOK, *Chief Judge*

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

No. 07-1016

| | |
|---|---|
| HOPKIRK UCHENNA ODUMOKO, <br> *Petitioner*, | Petition for Review of an Order of the <br> Board of Immigration Appeals. |
| *v.* | No. A79 800 055 |
| PETER D. KEISLER, Acting Attorney <br> General of the United States, <br> *Respondent*. | |

**O R D E R**

Hopkirk Uchenna Odumoko claims that if he returns to his native Nigeria, members of a secretive cult will force him to join them and commit violent acts, and if he refuses, they will either castrate or kill him. Odumoko sought asylum, withholding of removal, and relief under the Convention Against Torture, but the Immigration Judge ("IJ") found him not credible and denied his petition. The Board of Immigration Appeals affirmed. Because the IJ's decision is supported by substantial evidence, we deny the petition for review.

## Background

Odumoko was detained by border agents when he attempted to enter San Ysidro, California from Mexico with a fraudulent card identifying him as a U.S. citizen. He asserted in a sworn statement that he is a Nigerian citizen, and that he fled to avoid being forced to participate in a village ritual that involved "steal[ing] babies." His case was transferred to Chicago (he lives in Chicago with a sister), where he applied for asylum.

Odumoko's explanation of his asylum claim is confusing, but he appears to believe that if he returns to Nigeria members of a cult called the Mboko will track him down and force him to join. He argues that this threat constitutes persecution on account of his Catholic religion or his membership in an unspecified social group. There is little explanation in the record of who the Mboko are or why they exist, but Odumoko asserts that they dominate his family's home village of Umuahia, located in eastern Nigeria. According to Odumoko, when the first-born son of any Mboko member turns 21, he is forced to join. As part of his initiation, he must "go to other communities . . . to steal babies and kill them and get their heart" for the Mboko to use during burial rites. Should any first-born son refuse, says Odumoko, the cult will castrate or kill him, and then go after the next-oldest son.

Odumoko claims that the Mboko are hunting for him because his father and older brothers refused to join, despite his grandfather's having been the cult's chief priest. Odumoko never explained why the Mboko were interested in his father, who was not a first-born son. But Odumoko testified that the Mboko tried to force his father to join upon the death of Odumoko's grandfather some time before 1969. Odumoko said that his father refused to join because the cult's practices conflicted with his Christian faith. To avoid the Mboko, Odumoko's father moved his family to the city of Jos, which is located in a Muslim-majority state in northern Nigeria. There Odumoko's father was able to avoid the Mboko for the remaining years of his life—a period of more than 20 years.

Odumoko nonetheless blames the Mboko for his father's violent death in 1991. His father was killed when a religious riot broke out in Jos, and Muslim extremists targeted his house because the family held Catholic services there. Odumoko testified that a mob of Muslims beat his father and brother to death and burned down their house. Odumoko said that he was not home when the attack occurred, but he returned when he heard the commotion. At some point, Odumoko was chased by the mob and in his effort to escape he fell into a ditch, breaking his hip. The Mboko are at fault for these events, reasons Odumoko, because but-for his father's fear of the cult, his family never would have moved to Jos, where they were vulnerable as members of a religious minority.

Odumoko testified that it was his father's death, followed by his surviving older brothers' departures from Nigeria, that made him a target of the Mboko. After the riot, Odumoko and his two older brothers, Anthony and Martin, returned to Umuahia to bury their father. According to Odumoko, the Mboko tried to prevent the burial, but relented when a priest and the police intervened. After the burial, the Mboko summoned Odumoko and his older brothers to a meeting, and told them that because their father was dead, it was the oldest brother Anthony's turn to join them. The brothers fled that night to Lagos, a city in southwestern Nigeria, where they lived and worked until Anthony left Nigeria in 1994 and Martin in 1997.[1]

Five years after Martin's departure, in 2002, the Mboko finally focused their attention on Odumoko and made the threats that lie at the heart of his asylum claim. In January three Mboko members visited Odumoko at his employer's house and told him that if his older brothers did not join them, he would have to take their place. The Mboko left without incident. Approximately one month later, three other Mboko members visited him but were more insistent; they warned him that they would kill or castrate him if he did not join them. Odumoko says that he went to the police but they did not believe his story. The final visit came in March, when three Mboko members approached him at a gas station, threatened to burn him, and told him that "[i]t's going to be hot" if he did not join them. At this point Odumoko mentioned the threats to his employer, who helped him obtain a visa to leave Nigeria. Odumoko left in June 2002, eventually making his way to the United States via Mexico.

The IJ did not believe Odumoko's story, and found that even if Odumoko had testified credibly, the events he described neither amounted to past persecution nor supported a well-founded fear of future persecution. The BIA affirmed the IJ's adverse credibility finding, and agreed that Odumoko had not established either past, or a well-founded fear of future, persecution.

**Analysis**

On appeal Odumoko first challenges the IJ's adverse credibility determination, summarily asserting that his testimony was "credible, detailed, and consistent." We will uphold an adverse credibility finding if it is supported by

---

[1]Both brothers eventually came to the United States and filed asylum claims. The record does not reveal the status of Martin's claim, but we affirmed the denial of Anthony's application for asylum based on an adverse credibility determination. *See Johnson v. Gonzales*, 188 F. App'x 479 (7th Cir. 2006) (unpublished order).

substantial evidence and the IJ provides specific, cogent reasons that bear a legitimate nexus to the IJ's finding. *See Shmyhelskyy v. Gonzales*, 477 F.3d 474, 478-79 (7th Cir. 2007); *Balogun v. Gonzales*, 374 F.3d 492, 498 (7th Cir. 2004). Once the IJ makes an adverse credibility determination, "the applicant must come forward with a convincing explanation of the discrepancies or extrinsic and credible corroborating evidence." *See Jamal-Daoud v. Gonzales*, 403 F.3d 918, 922 (7th Cir. 2005).

Odumoko's challenge to the credibility determination is notably conclusory and disregards the specific reasons the IJ gave for the finding. For example, the IJ found unconvincing Odumoko's explanation of why the Mboko, if they were such a threat, would leave his father unmolested for more than 20 years. Substantial evidence supports the IJ's incredulity. Odumoko's only explanation was that his father had an older brother named Edward who *might* have been a member of the cult and helped protect his father. When asked why Edward could not also protect him, Odumoko replied that he thought Edward was tired of protecting the family. Odumoko makes no attempt to clarify this testimony in his brief on appeal. He likewise ignores the IJ's finding that he had not sufficiently explained why the Mboko delayed threatening him until five years after Martin left Nigeria. Again, the IJ was correct to find this testimony lacking. Odumoko simply asserted that people like himself whose forefathers held important Mboko posts "were not forced immediately to join"; but he never explained why the Mboko waited so long to approach him.

Odumoko argues that his story is supported by his brother-in-law's testimony that the Mboko exist and that they targeted his family. But as the IJ emphasized, his brother-in-law did not suggest why the Mboko left Odumoko's family members alone for so long. In any event, the brother-in-law had been living in the United States for more than 30 years, and thus he had no first-hand knowledge of the events underlying Odumoko's claims.

Odumoko also relies on an academic article, written by a professor at the University of Calabar, describing a diety named Mboko who seeks first-born sons as its priests. But the article is equally unhelpful. It contains no date, volume number, or other evidence of publication that could be used to verify its authenticity. More importantly, it does not answer the IJ's questions about why the cult left Odumoko alone for years. Because Odumoko points neither to reliable corroborating evidence nor to evidence that might explain the key weaknesses in his story, he cannot show that his is the "extraordinary circumstance" that would lead us to reverse the IJ's credibility determination. *See Jamal-Daoud*, 403 F.3d at 922.

Odumoko next argues that the IJ misunderstood the nature of his asylum claim by overlooking his religious persecution argument. Odumoko points out that he checked the box for religious persecution on his asylum application and argues that he adequately raised a claim for persecution because of his Catholicism. But the IJ didn't disregard his religious persecution claim; his own counsel disavowed it. At the asylum hearing Odumoko's counsel stated that Odumoko was "not really" claiming he left Nigeria because of his religion; rather, "the main basis" of the claim, he clarified, was membership in a social group. Counsel argued that Odumoko's claim of persecution was based on his ties to the Mboko, whom the family sought to avoid by relocating to a predominantly Muslim state. The IJ understandably considered this explanation unpersuasive—the riots were carried out by Muslim extremists unrelated to the cult more than 20 years after the family fled the Mboko.

In any event, even if the IJ improperly disregarded Odumoko's claim of religious persecution, the BIA correctly concluded that it was not supported by the record. As the Board noted, one incident of sectarian violence against family members more than a decade ago was "too attenuated" to demonstrate either past persecution or a well-founded fear of future persecution. Persecution of an applicant's family members, without additional evidence that the applicant himself would be subjected to future persecution, does not establish a well-founded fear of future persecution. *See Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007).

The record also supports the IJ's conclusion that Odumoko cannot establish persecution based on membership in a social group. Odumoko asserts that the persecution is established by the Mboko's three threats toward him in 2002. But he acknowledged at his hearing that the Mboko's harassment never escalated beyond verbal warnings and that the threats were not imminent. Indeed, weeks passed between each visit and months passed between the last visit and Odumoko's departure from Nigeria. Unfulfilled and remote threats are generally insufficient to establish past persecution, *see Ahmed v. Gonzales*, 467 F.3d 669, 674 (7th Cir. 2006); *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997), and Odumoko has not explained why the threats in his case are exceptional. Nor has he shown, as he must, that he genuinely fears persecution if returned to Nigeria. *See Mema*, 474 F.3d at 418. Credibility is the "linchpin" of a "well-founded fear" claim. *See Balogun*, 374 F.3d at 499; *Capric v. Ashcroft*, 355 F.3d 1075, 1093 (7th Cir. 2004). Because the IJ's determination that Odumoko was not credible is supported by the record, the petitioner's "well-founded fear" claim necessarily fails.

Because the evidence, even if believed, does not establish that Odumoko is entitled to asylum, his claim for withholding of removal necessarily fails. *See Boykov*, 109 F.3d at 418 (and cases cited therein). And Odumoko has not raised any

argument regarding his Convention Against Torture claim, so the issue is waived. *See Ahmed*, 467 F.3d at 676. Accordingly, we DENY the petition for review.